# IN THE SUPREME COURT OF IOWA

No. 13–0988

Filed February 26, 2016

Amended May 5, 2016

**STATE OF IOWA,**

    Appellee,

vs.

**DONALD BENJAMIN EARL REED,**

    Appellant.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Black Hawk County, Todd A. Geer, Judge.

Defendant seeks further review of a court of appeals decision affirming his convictions and 100-year prison sentence. **COURT OF APPEALS DECISION AFFIRMED IN PART AND VACATED IN PART; DISTRICT COURT JUDGMENT AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED FOR RESENTENCING.**

Mark C. Smith, State Appellate Defender, and Patricia Reynolds, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Linda J. Hines, Assistant Attorney General, Thomas J. Ferguson, County Attorney, and Brad Walz, Assistant County Attorney, for appellee.

**WATERMAN, Justice.**

In this appeal, we review a twenty-seven-year-old defendant's challenges to his sentence of up to 100 years for drug dealing, child endangerment, and possession of firearms. The jury found the defendant guilty on those offenses, which he committed as an adult. The firearm conviction automatically doubled the sentence for his cocaine offense from twenty-five to fifty years. The district court had discretion to sentence him to as little as fifty years with immediate parole eligibility, or up to 150 years based on another enhancement for his prior felony drug conviction at age seventeen. The sentencing court chose to double but not triple the fifty-year sentence and require him to serve one-third of the sentence before becoming eligible for parole. This meant he could be on parole as early as age forty-three with earned-time credit.

The defendant argues the evidence was insufficient to prove his constructive possession of the drugs and firearms, his trial counsel was ineffective, and his sentence is cruel and unusual punishment violating the Iowa Constitution because it is based on a prior conviction for an offense he committed as a minor. The court of appeals affirmed his convictions and sentence, and we granted his application for further review.

For the reasons elaborated below, we hold the evidence was insufficient to prove his constructive possession of firearms, requiring resentencing without the firearm conviction and enhancement. We affirm his remaining convictions. We leave intact the court of appeals decision rejecting his ineffective-assistance-of-counsel claims. Because defendant will be resentenced, we do not reach his constitutional challenge to his original sentence. Thus, we affirm in part and vacate in

part the court of appeals decision, reverse defendant's convictions for possession of firearms, and remand the case for resentencing.

## I. Background Facts and Proceedings.

In March 2012, Waterloo police officers Michael Girsch and Edward Savage began conducting surveillance of a house to find an individual who was suspected of trafficking drugs from Chicago. The house, located at 1320 Randolph Street, is a single-family home with a detached garage. The house is owned by Chad Wolf, and the utilities are in Wolf's name. The police suspected drugs were sold from this location. During surveillance spanning three weeks, cars frequently pulled up in the adjacent alley, and people went into the house for brief visits. The officers never saw the original target of their investigation there and soon focused their investigation on Donald Reed.

The officers frequently observed Reed at the Randolph Street home. His girlfriend, Alicia Buchanan, rented the house and lived there with her two daughters, A.R., age two, and A.B., age four. Reed is the father of A.R. The officers observed Buchanan playing outside with her children and taking out the garbage. Reed always arrived in a white Buick and parked in the driveway. He entered the house without knocking or ringing the doorbell, and his observed visits lasted for hours. Reed was also seen taking out the garbage.

On April 5, Officer Savage conducted a "trash rip" at the house by retrieving garbage bags left curbside and searching the contents. He found several small plastic bags with ripped corners consistent with drug packaging, dryer sheets,[1] an envelope, a Rent-A-Center application, and

---

[1]Officer Savage testified that dryer sheets and fabric softener are used in drug packaging to mask the scent of certain narcotics.

a Rent-A-Center bill in the trash. The envelope, postmarked February 15, was addressed to Buchanan at a different address. The Rent-A-Center application stated that Buchanan and Reed owned 1320 Randolph Street subject to a mortgage. The application listed Reed as Buchanan's husband in one section and father in another. Reed's address was listed as 548½ Riehl Street in Waterloo, another house where he was observed. The rental application was completed in one person's handwriting and signed by Buchanan alone. The Rent-A-Center bill was addressed to Buchanan and Reed at 1320 Randolph Street.

On April 11, Officer Girsch arrived at the house around 9:30 p.m. and saw Reed's Buick in the driveway. Buchanan stepped outside several times but never left the yard. Officer Girsch departed around midnight to get a search warrant and returned at 7:30 a.m. Reed's Buick was still parked in the driveway. Officer Girsch saw Wolf go inside for fifteen minutes and leave. Reed left the house at 11:20 a.m. Officer Girsch coordinated with other officers to follow Reed and conduct a traffic stop.

Officer Savage stopped Reed at 11:30 a.m. near Young Arena, an ice rink in downtown Waterloo. Reed gave Officer Savage his registration, but he did not have an ID. The Buick was registered in Reed's name. The address on the registration was 548½ Riehl Street. Officer Savage searched Reed and found a cell phone and $523 in cash "bungled up" in Reed's front pocket. Reed did not have a wallet, drugs, or a weapon. Officer Savage placed Reed under arrest and took him to the Waterloo police station.

Within minutes of Reed's traffic stop, Officers Girsch, Albert Bovy, and Steve Newell executed the search warrant at 1320 Randolph Street. Officers Bovy and Girsch went to the front door while Officer Newell went

to the rear. Buchanan responded to Officer Girsch's knock. Officer Girsch asked to come in, and Buchanan asked why. When he explained that he had a search warrant, Buchanan ran towards the kitchen. Officer Girsch kicked in the door. The officers found Buchanan in the hallway leading to the bedrooms and the girls hiding under a bed. Officer Bovy directed Buchanan and the girls to sit on the couch while the police searched the home.

The house had three bedrooms, a kitchen, a living room, and an unfinished basement. One bedroom was furnished for adults, one was a children's room with two small beds, and the third was empty. A pungent smell of burnt marijuana emanated from the kitchen. The officers saw white powder scattered on the table and countertops and a small plastic bag near the powder. Loose marijuana leaves were on the kitchen table.

The officers found more drugs and two firearms in the adult bedroom. Against one wall was a built-in with open cabinets and a television. The left side of the built-in had floor-to-ceiling cabinets containing men's and women's clothing. When the officers began searching the clothing, they found a small plastic bag with twenty-seven grams of crack cocaine underneath a stack of clothes with a folded pair of large men's pants on top. Reed weighed 210 pounds. As they searched, a bag of marijuana fell out of the clothing. The right side of the built-in had a large television with a cabinet on top. That cabinet contained an Xbox and a brown purse. When Officer Girsch searched the cabinet, he saw a pink lotion bottle and a gun barrel pointing out from behind the Xbox. The gun barrel was not visible from the center of the room. After photographing the Xbox, Officer Girsch moved it and found two guns—a Springfield .45 automatic 1911 and a Jennings 9 mm

firearm. Both guns were loaded and were within four feet of the cocaine. Two partial fingerprints were found—one on each gun. Neither print matched Buchanan or Reed. Officer Girsch found a torn small plastic bag and two bottles of nail polish inside the purse.

More items were found on top of a dresser across the room: a box of small plastic bags, small plastic bags with the corners torn off, a digital scale, white powder, a Wisconsin ID with white powder caked on one side, and a cell phone. The name on the ID was Ramon Brumfield. The top drawer of the dresser was open and contained cash, more small plastic bags and another pair of men's jeans.

In the children's bedroom, Officer Girsch found a crumpled dollar bill and a marijuana roach on the mattress. In the children's closet, there was a white nylon shoulder bag hanging from the door handle with loose marijuana inside it. The hallway closet contained more ripped small plastic bags.

Reed was in a holding cell. Around 3:30 p.m., he asked for Officer Savage and suggested an interest in cooperating, stating:

> I need to talk to you, but I can't do shit man. I got to make sure that my girl, she—I mean, we've got to do it together or something, because, I mean, we can help you out, dude. We got kids. The only thing, sir, me and my girl, we would help you. We would help you get—to get some because, you know what I saying, because I want her to look like I know mother f**kers.

The State brought seven charges against Reed: possession of more than ten but less than fifty grams of cocaine base[2] with intent to deliver while in possession or control of a firearm in violation of Iowa Code sections 124.401(1)(*b*)(3) and 124.401(1)(*e*) (2011); failure to affix a drug

---

[2]Cocaine base is the scientific term for crack cocaine.

stamp in violation of section 453B.12; possession of a firearm by a felon in violation of section 724.26; two charges of child endangerment in violation of sections 726.6(1)(*a*) and 726.6(7); possession of powder cocaine as a second offender in violation of section 124.401(5); and possession of marijuana as a second offender in violation of section 124.401(5). The State made a plea offer of fifty years with no recommended mandatory minimum. Reed rejected the plea.

Reed's five-day jury trial began on April 23. The police officers testified regarding their surveillance of the house, the search, and Reed's statements. Officer Girsch testified to his experience investigating drug crimes and explained the pattern of visitors to the house was consistent with drug dealing, as were the ripped small plastic bags found throughout the house. He noted that digital scales are used to package drugs by weight for distribution and that dealers chip off pieces from large rocks of cocaine, such as those found in the built-in, to sell for profit.

Officer Girsch testified the cocaine found in the bedroom cabinet was enough for over 200 dosages. He explained the amount found in the house was consistent with drug distribution rather than personal use:

> Q. [W]hen you encounter people who use crack cocaine, about how much do you see people who just use crack cocaine use at a time? A. Anywhere from a tenth of a gram to a little bit above that.
>
> Q. And would that, in essence, be a couple of the pebbles that are in there? A. Yes.
>
> Q. Anyone—ever seen anyone use an ounce of crack cocaine before? A. No.
>
> Q. Is it possible to use an ounce of crack cocaine like that in a setting or in a course of a period of time without doing severe medical issues to yourself? A. No.
>
> Q. Is the quantity of crack cocaine that's in there in State's Exhibit L, without, not taking into account any scales, any other plastic bags, the quantity in and of itself

located in State's Exhibit L, is it consistent with sale and distribution or with personal use? A. Sale and distribution.

Q. Why is that? A. Because of the large quantity, it's not—you would never buy that much just to use it. I mean, this is a quantity that's always purchased to rock out and sell, and just the fact that you couldn't smoke that much crack.

Q. Have you ever seen a crack addict or a crack user with that much? A. No.

Q: And as far as the use of crack cocaine, is the person who's a user of crack cocaine, do you know anyone who's a user of crack cocaine that's not an addict of crack cocaine? A. No.

Q. From your training and experience, is the use of crack cocaine a fairly addictive—a fairly addictive drug to use? A. Very addictive.

Q. From your training and experience, do people who use quantities of crack cocaine, do you see them deal in quantities of crack cocaine of that size? A. No.

Q. Why is that? A. A lot of it's because people get so addicted to the drug that they—if they have more than what they're actually smoking, they just end up smoking it all up, and just because people addicted are spending money so much just to buying—or, fund their habit, they're not going to possess that much.

Officer Girsch testified that it was common to find large amounts of cash with a drug dealer, and the small amount in the house was unusual. Officer Savage, who had seized the $523 in cash from Reed, testified that amount was consistent with drug dealing and noted Reed lacked lawful employment. Officer Girsch was unaware of a Brumfield[3]—the name on the Wisconsin ID in the bedroom—living in Waterloo, but he knew Reed was from Wisconsin.

Officer Girsch testified why he looks for firearms when investigating drug crimes:

Many times people who are selling narcotics are going to have firearms because they want to protect their stash,

---

[3]Brumfield was not the original target of the investigation.

> protect their money when they've got large quantities of money in the house. Also, the fear of drug rips, which is when people get information that another dealer may have just gotten a large shipment in or purchased a large quantity or re-upped, you know, they'll wait, they'll maybe do surveillance on the house themselves. Once that subject leaves the house, they'll kick the door in, try and steal their drugs so that they can sell them. So that's what we commonly refer to as a drug rip. But, yeah, protecting the stash and protecting the drugs.

Officers Girsch and Nissen elaborated that drug rips are often violent but reported rarely to the police. Officer Nissen noted that a person dealing crack cocaine would keep it in a familiar place for safekeeping.

The officers testified regarding evidence recovered from Reed's cell phone. A photo found on the phone and taken on March 7 showed the television and the built-in with closed cabinets in the adult bedroom. Another photo taken on March 11 showed Reed with white powder on his chin, cheeks, and lips. Officer Girsch testified a cocaine user would not put the substance on his skin. Reed's phone also had a photo of an assault rifle but no photos of the handguns found in the bedroom. Several text messages on Reed's cell phone were consistent with drug dealing. For example, on March 8, 2012, Reed received a text, "here i cum." On March 11, he had an unsent message "Am come to you ill call you he it crack Free my niggas." That day, he received a message saying, "hit me when u cum back i cant find no ride." On March 12, he received a text "cum get me." Sixty-nine of Reed's ninety incoming voice calls in the preceding three days were less than one minute long. Officer Savage explained that the number of short incoming and outgoing calls, like the short-term traffic at the house, was common for drug dealers.

Reed did not testify, but his trial counsel cross-examined the officers, attempting to cast doubt on Reed's connection to the Randolph Street house. Counsel emphasized that Wolf owned the house and all of

the utilities were in Wolf's name. Reed was also observed at 548½ Riehl Street, the other address listed on the Rent-A-Center application. Officer Girsch was not able to see inside the Randolph Street house during his surveillance because the blinds were drawn and blankets covered many of the windows.

The jury instructions required the State to prove beyond a reasonable doubt that Reed had actual or constructive possession of the drugs and firearms.[4] Instruction No. 27 defined "possession":

---

[4]The marshaling instruction for "Possession of a Controlled Substance, Cocaine Base, With Intent to Deliver," stated:

> The state must prove all of the following elements of Possession of a Controlled Substance, Cocaine Base, With Intent to Deliver:
>
> 1. On or about the 12th day of April, 2012, the defendant knowingly possessed a controlled substance, cocaine base.
>
> 2. The defendant knew that the substance he possessed was a controlled substance, cocaine base.
>
> 3. The defendant possessed the cocaine base with the intent to deliver a controlled substance.
>
> If the state has proved all of these elements, the defendant is guilty of Possession of a Controlled Substance, Cocaine Base, With Intent to Deliver. If the state has proved only elements 1 and 2, but not element 3, the defendant is guilty of Possession of a Controlled Substance, Cocaine Base. If the state has failed to prove element number 1 or 2, the defendant is not guilty.

The marshaling instruction for "Possession of a Controlled Substance, Marijuana," stated:

> The state must prove both of the following elements of Possession of a Controlled Substance, Marijuana:
>
> 1. On or about the 12th day of April, 2012, the defendant knowingly or intentionally possessed marijuana.
>
> 2. The defendant knew that the substance he possessed was a controlled substance, marijuana.
>
> If the state has proven both of these elements, the defendant is guilty of Possession of a Controlled Substance. If the state has failed to prove either of the elements, the defendant is not guilty.

The word "possession" includes actual as well as constructive possession, and also sole as well as joint possession.

A person who has direct physical control of something on or around his person is in actual possession of it.

A person who is not in actual possession, but who has knowledge of the presence of something and has the authority or right to maintain control of it either alone or together with someone else, is in constructive possession of it.

If one person alone has possession of something, possession is sole.  If two or more persons share possession, possession is joint.

Instruction No. 30 addressed the element of "immediate possession of a firearm" for the enhancement:

To have immediate possession of a firearm means to have actual possession of the firearm on or around one's person.  To have immediate control of a firearm means to have the firearm in close proximity so that the person can reach for it or claim dominion or control over it.  In order to prove that the defendant had immediate possession or control of a firearm, the state must prove that the defendant had knowledge of its existence and its general location.

Neither Reed nor the State objected to the jury instructions defining possession.

The jury found Reed guilty on all charges.  The jury answered interrogatories regarding the cocaine charge and firearm enhancement:

---

The marshaling instruction for "Possession of a Firearm by a Felon" stated:

The state must prove both of the following elements of Possession of a Firearm by a Felon:

1.      On or about the 12th day of April, 2012, the defendant knowingly had under his dominion and control or possession a firearm.

2.      The defendant was previously convicted of a felony.

If the state has proven both of the elements, the defendant is guilty of Possession of a Firearm as a Felon.  If the state has failed to prove either of the elements, the defendant is not guilty.

To the crime charged in Count I, we, the jury, find the defendant, DONALD BENJAMIN EARL REED:

__X__ Guilty of Possession of a Controlled Substance, Cocaine Base, With Intent to Deliver. **

. . . .

**\*\* If you find the defendant, DONALD BENJAMIN EARL REED, guilty of Possession of a Controlled Substance, Cocaine Base, With Intent to Deliver, you must answer the following interrogatories.**

(1) We, the jury, further find the defendant, DONALD BENJAMIN EARL REED, Possessed With the Intent to Deliver:

__X__ More than 10 grams of a substance that contains cocaine base;

. . . .

(2) We, the jury, further find the defendant, DONALD BENJAMIN EARL REED, Possessed With the Intent to Deliver:

__X__ While in the immediate possession of a firearm.

On May 3, Reed pled guilty to being a second offender. The department of corrections submitted a presentence investigation (PSI) report to the court on June 6. The PSI detailed Reed's childhood and family life. Reed was born and raised in Milwaukee, Wisconsin. His mother was convicted of federal drug charges in 1999 and sentenced to twenty-five years in prison. Reed was placed in a group home. His father has an extensive criminal history in Wisconsin and Iowa. Reed reported his father has a history of alcohol abuse and crack cocaine abuse. Reed began living on his own at age thirteen. In 2008, he moved from Milwaukee to Waterloo to be near his father.

The PSI documented Reed's self-reported drug and alcohol abuse. Reed never claimed to be addicted to crack cocaine and denied using that drug:

> The defendant admits to a history of daily marijuana use. He wrote, "I use to use every day to take the pain away I wish I had a normal life like the other kids." He also admits to a history of daily Ecstasy use in the 2000's, with his last

use being in 2008 or 2009. He denied the use of any other illicit drugs including cocaine, methamphetamine and heroin and denied any history of prescription drug use.

The PSI noted Reed had a sporadic employment history and never held a job for over one year. He was unemployed at the time of his arrest. Police records noted Reed was a member of the Southside Gang and known to carry weapons, but Reed denied any gang involvement. Reed said he was supported financially by various girlfriends.

The PSI listed Reed's prior juvenile arrests and dispositions in Wisconsin: possession of marijuana, assault and battery, loitering, curfew violation, and take and drive vehicle without consent. These dispositions all occurred between ages fifteen and sixteen. Reed also had numerous adult convictions: driving while suspended (five convictions); retail theft; manufacture of cocaine with intent to deliver five grams or less; battery; third-degree burglary; assault causing bodily injury; and interference with official acts. Reed had been incarcerated over eight years for these convictions.

The PSI report recommended a 150-year prison term for possession with intent to deliver more than ten grams of cocaine base while in possession or control of a firearm and being a second offender; a five-year prison term for the drug tax stamp violation; a five-year prison term for possession of a firearm by a felon; two-year prison terms for each child endangerment charge; a two-year prison term for possession of cocaine base, second offense; and a two-year prison term for possession of marijuana, second offense. The PSI report also recommended Reed participate in substance abuse treatment and mental health counseling; obtain an employable skill; and make regular payments towards fines, restitution, court costs, and court-appointed attorney fees.

Reed was sentenced on June 7. The State recommended a 150-year prison term with a fifty-year mandatory minimum. Reed's attorney advocated for a sentence without a mandatory minimum to allow him a chance at parole and rehabilitation.

Defendant's convictions included possession of ten or more but less than fifty grams of cocaine base with intent to deliver in violation of Iowa Code section 124.401(1)(*b*)(3)—a class "B" felony that, pursuant to Iowa Code section 902.9(1)(*b*), carries a twenty-five-year indeterminate sentence. The jury found he committed that crime while in the immediate possession of a firearm in violation of section 124.401(1)(*e*), which provides the drug offender "shall be sentenced to two times the term otherwise imposed by law." Reed admitted to being a subsequent drug offender based on his felony conviction at age seventeen. Under Iowa Code section 124.411(1), his prior conviction subjected him to an enhancement of up to three times the maximum sentence. This meant the indeterminate sentence could be between fifty and 150 years. Reed was also subject to Iowa Code section 124.413(1), which states,

> A person sentenced pursuant to section 124.401, subsection 1, paragraph "*a*" . . . [or] "*e*" . . . , shall not be eligible for parole until the person has served a minimum period of confinement of one-third of the maximum indeterminate sentence prescribed by law.

However, the district court had discretion to "sentence the person to a term less than provided by [section 124.413] if mitigating circumstances exist." Iowa Code § 901.10(1). Section 901.10(1) allows the district court to reduce or eliminate the mandatory minimum sentence but not the indeterminate sentence. *See State v. Iowa Dist. Ct.*, 630 N.W.2d 778, 782 (Iowa 2001).

The Court sentenced Reed to 100 years in prison with a mandatory one-third minimum term:

> THE COURT: Mr. Reed, you know you've committed very serious crimes.
>
> THE DEFENDANT: Yes.
>
> THE COURT: And those serious crimes carry severe penalties because society recognizes the dangerous combination between repeat drug offenders, firearms, and dealing in large amounts of controlled substances, which are very dangerous to be distributed out in the community. The law also recognizes the importance of making sure we protect children from being involved in dangerous activities.
>
> And you bring with you into this courtroom a criminal history. You've had lots of opportunity over the years to figure out, what it—what, it sounds like anyway, you're starting to figure out, that you don't want to live your life this way. But you have been. And we've had lots of good people spend a lot of time with you over the years trying to get you to figure that out. You've had a taste of prison in the past trying to get you to figure that out. It wasn't as long as the one you're going to be facing as a result of these most recent charges, but many times it takes someone to have their liberty, which most of us value a great deal, have our liberty taken away to truly understand what it means to live in a free society. And your society isn't going to be free for a while. But it's my hope that in fashioning this sentence, when you do earn parole, you are going to come out someone who is—who is ready to change his life, who has absolutely no interest in going back to the type of lifestyle and the dangerous criminal activities that bring you here today. You're going to be older so perhaps you're just going to be tired of it. You're going to have your liberty deprived for an extended period of time so perhaps you will value and appreciate your liberty more when you get out and that will be enough to convince you that you're not going to engage in these types of behaviors again. You're a young person, at least in my book. You're 28; is that right?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Twenty-eight years old. But you're not so young that you shouldn't have figured out by now that this isn't—this isn't the type of life you want to live.
>
> And yes, I know, I read through the presentence investigation and report, I read the letter that your sister wrote on your behalf, I know that you've had a tough life. And I know that you haven't had people, that are real close to you anyway, give you much guidance. But our criminal

justice system has, for the last decade or so, had people who aren't—you don't love them, you probably don't care much for them, but it's their job to try to help you figure it out and you haven't yet. And so that the sentence that I'm going to impose here I hope will give you time and incentive to get that figured—figured out.

The law prescribes a sentence, 150-year sentence. You deserve that sentence because of the history you bring in with you and because of the very serious crimes you've committed. I do have some discretion, however. Even though the law prescribes a 150-year sentence, I'm not going to triple the sentence; I'm going to double the sentence. I'm going to double it because it's appropriate because of your being in the immediate possession of a firearm and the fact that you are a repeat offender. But, also, by only doubling it rather than tripling it and still applying the one-third minimum sentence, you're going to be young enough by the time you earn parole, assuming that you're a good—a good prisoner and not have a bunch of rules violations, you're going to be young enough when you do earn parole to still be able to do something productive in our society, and I'm very hopeful that you will. And the sentence is appropriate for the reasons I have just stated as well as your age, your history, your family situation and the nature of the offenses. I agree that the sentences should all run at the same time, they should run concurrently with each other.

With earned-time credits, the sentence imposed by the district court allowed Reed to be eligible for parole by age forty-three. *See* Iowa Code § 903A.2(1)(*a*) (allowing earned-time credit of 1.2 days for each day served); *State v. Allensworth*, 823 N.W.2d 411, 414–15 (Iowa 2012) (discussing earned-time credit).

Reed appealed, and we transferred the case to the court of appeals. Reed argued: (1) his trial counsel was ineffective for failing to challenge the admissibility of evidence produced in the search and to investigate where Reed lived, (2) the evidence was insufficient to prove constructive possession of the drugs or firearms, and (3) his 100-year sentence was cruel and unusual punishment because he was not given an individualized hearing regarding his prior drug conviction at age seventeen. The court of appeals affirmed his convictions and sentence. The appellate court found the evidence sufficient for each conviction. It

rejected his cruel and unusual punishment claim, holding Reed did not show a "confluence of the factors articulated in [*State v. Bruegger*, 773 N.W.2d 862, 884 (Iowa 2009),] which would lead to an inference of gross disproportionality." Moreover, Reed failed to show other circumstances, such as his lack of recidivism or a broad enhancement statute, that could create an inference of gross disproportionality under *State v. Oliver*, 812 N.W.2d 636, 651–52 (Iowa 2012). The court of appeals concluded the absence of these factors combined with *Oliver*'s "principle of deference to legislative penalties counsels against an inference of gross disproportionality, as does the court's focus on the rarity of such an inference." *Id.* We granted Reed's application for further review.

## II. Scope of Review.

"On further review, we have the discretion to review all or some of the issues raised on appeal . . . ." *State v. Harrison*, 846 N.W.2d 362, 365 (Iowa 2014) (quoting *State v. Clay*, 824 N.W.2d 488, 494 (Iowa 2012)). We exercise that discretion here and confine our review to the sufficiency of the evidence of constructive possession. We decline to review the court of appeals decision regarding Reed's ineffective-assistance-of-counsel claims. The court of appeals decision shall stand as the final decision on those claims. *See State v. Pearson*, 804 N.W.2d 260, 265 (Iowa 2011). Because we conclude Reed must be resentenced, we do not reach his constitutional challenge to his original sentence.

We recently recapitulated our standard of review for sufficiency of the evidence supporting a guilty verdict in *State v. Thomas*:

> Sufficiency of evidence claims are reviewed for . . . correction of errors at law. In reviewing challenges to the sufficiency of evidence supporting a guilty verdict, courts consider all of the record evidence viewed in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence. [W]e will uphold a verdict if

substantial record evidence supports it. We will consider all the evidence presented, not just the inculpatory evidence. Evidence is considered substantial if, when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt. Inherent in our standard of review of jury verdicts in criminal cases is the recognition that the jury [is] free to reject certain evidence, and credit other evidence.

847 N.W.2d 438, 442 (Iowa 2014) (alterations in original) (quoting *State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012)).

### III. Analysis.

Possession may be actual[5] or constructive. *Id.* The State relies on a theory of constructive possession in this case. The police found no weapons or drugs on Reed or in his Buick at the time of his arrest. Rather, the drugs and weapons were found at 1320 Randolph Street, the house occupied by Buchanan and her children (including Reed's daughter). The house is owned by Chad Wolf, who stopped in for fifteen minutes the morning of the search but left before the police entered. Reed was a frequent visitor, if not a resident or overnight guest, at that address. The court of appeals held the evidence was sufficient to affirm all of his convictions. We disagree in part and conclude the evidence was sufficient to uphold the guilty verdicts on the drug convictions but insufficient to prove Reed's possession of the firearms.[6]

---

[5]Actual possession requires proof of a defendant's physical possession of the drugs or firearms at some point in time. *See, e.g., Thomas*, 847 N.W.2d at 442 (reviewing our actual possession jurisprudence); *State v. Vance*, 790 N.W.2d 775, 784 (Iowa 2010) (holding actual possession requires direct or circumstantial evidence that the drugs were on his or her person "at one time").

[6]Reed was convicted of possession of ten or more grams of cocaine base with intent to deliver while in the immediate possession of a firearm in violation of Iowa Code sections 124.401(1)(*b*)(3) and 124.401(1)(*e*), possession of marijuana in violation of section 124.401(5), and possession of a firearm by a felon in violation of section 724.26. The State was required to prove beyond a reasonable doubt that Reed possessed the drugs and weapons. *See* Iowa Code § 124.401(1) ("[I]t is unlawful for any person to manufacture, deliver, or possess . . . a controlled substance . . . ."); *id.* § 724.26(1) ("A person who is convicted of a felony in a state or federal court . . . who knowingly has

Constructive possession exists when the evidence shows the defendant "has knowledge of the presence of the controlled substance and has the authority or right to maintain control of it." *State v. Maxwell*, 743 N.W.2d 185, 193 (Iowa 2008) (quoting *State v. Carter*, 696 N.W.2d 31, 38–39 (Iowa 2005)). Constructive possession may be proved by inferences. *Id.* Although the doctrine of constructive possession evolved in drug-possession cases, we apply the same principles in firearm cases. *See State v. Eickelberg*, 574 N.W.2d 1, 3–4 (Iowa 1997) (analyzing constructive possession of a firearm based on drug cases).

"The existence of constructive possession turns on the peculiar facts of each case." *State v. Webb*, 648 N.W.2d 72, 79 (Iowa 2002). Constructive possession may be inferred when the drugs or firearms are found on property in the defendant's exclusive possession. *State v. Kern*, 831 N.W.2d 149, 161 (Iowa 2013). But, Reed did not have exclusive possession of the house. When the premises are jointly occupied, additional proof is needed. *Id.*

"[P]roximity to the [contraband], though pertinent, is not enough to show control and dominion." *State v. Cashen*, 666 N.W.2d 566, 572 (Iowa 2003). We have identified several nonexclusive factors to consider in determining whether the defendant possessed contraband discovered in jointly occupied structures:

> (1) incriminating statements made by a person; (2) incriminating actions of the person upon the police's discovery of a controlled substance among or near the person's personal belongings; (3) the person's fingerprints on the packages containing the controlled substance; and (4) any other circumstances linking the person to the controlled substance.

under the person's dominion and control or possession . . . a firearm or offensive weapon is guilty of a class 'D' felony.").

*Kern*, 831 N.W.2d at 161 (quoting *Maxwell*, 743 N.W.2d at 194). The last factor is a "catchall" that captures other relevant circumstantial or direct evidence. *State v. DeWitt*, 811 N.W.2d 460, 475 (Iowa 2012). "The evidence of guilt must generate more than mere suspicion, speculation, or conjecture." *Id.*

We separately address the sufficiency of the evidence regarding Reed's possession of the drugs and firearms.

**A. Constructive Possession of the Drugs**. Viewing the facts in the light most favorable to the State, the evidence was sufficient for the jury to find Reed's constructive possession of the drugs discovered at the Randolph Street home. The jury could infer from direct and circumstantial evidence that Reed was staying there with Buchanan and their daughter and shared the only adult bedroom where most of the cocaine base was found. The police surveillance team observed Reed visiting the home and staying for hours at a time in the weeks preceding his arrest. He always arrived in the same white Buick, parked in the driveway, and walked in without knocking. No other males were observed living there. Documentary evidence tied Reed to Buchanan and the Randolph Street address: the Rent-A-Center bill was addressed to both of them there, and the rental application Buchanan signed identified Reed as her husband. Reed's Buick was parked in the driveway from 9:30 p.m. to midnight before the search and was still there at 7:30 a.m. the day of the search until Reed drove it away at 11:30 a.m. The jury could infer he spent the night and morning there until the search was executed minutes after his departure.

Most of the cocaine base, twenty-seven grams (enough for 200 doses), was found beneath men's pants in the cabinet in the bedroom along with a bag of marijuana. Reed's cell phone had a photo taken of

the cabinet a few weeks earlier. Reed weighed 210 pounds; the pants were large. There were also men's pants on the floor and in the dresser drawer. A reasonable juror could conclude that Reed, a frequent visitor and father of one of the children in the home, owned the pants and shared the bedroom with Buchanan, the mother of his child living there. Reed's phone also had a photo of him with white powder on his chin, cheeks, and lips. White powder was found on the bedroom dresser with a scale and small plastic bags with cut corners used for drug packaging. More white powder and loose marijuana was in the kitchen. Police observed persons making brief visits to the home, consistent with drug trafficking. Reed's cell phone had sixty-nine calls of less than one minute during a three-day period and text messages arranging visits and referencing "crack," also indicative of drug trafficking. Reed, who was unemployed, had $553 in cash on him when arrested. Reed obliquely suggested to police he and Buchanan could "help" them to avoid incarceration.

When these facts collectively are viewed in the light most favorable to the State, substantial evidence supports Reed's drug convictions: "[T]his is not a case where proof of [possession] depends upon a single piece of evidence from which two reasonable inferences could be drawn." *State v. Keeton*, 710 N.W.2d 531, 535 (Iowa 2006); *cf. State v. Truesdell*, 679 N.W.2d 611, 618–19 (Iowa 2004) ("[W]hen two reasonable inferences can be drawn from *a piece* of evidence, we believe such evidence only gives rise to a suspicion, and, without additional evidence, is insufficient to support guilt." (Emphasis added.)). We must view the evidence supporting the guilty verdicts as a whole, not as separate pieces of evidence viewed in isolation. *Keeton*, 710 N.W.2d at 535 ("[I]t is not for us to interfere with the finding made when supported by substantial

evidence, even though the evidence may have also supported a finding favorable to the defendant.").

We recently surveyed our cases on drug possession in jointly occupied places and held sufficient evidence supported drug convictions in *State v. Thomas*. Officers entered an apartment rented by Raymond Norvell after observing marijuana use through a window. *Thomas*, 847 N.W.2d at 440. Six people were inside the kitchen; two, Isaiah Henderson and Tremayne Thomas, ran into a bedroom. *Id.* Thomas tried to hold the door shut, but the officer shouldered the door open and ordered Thomas and Henderson to the floor. *Id.* Henderson complied, but the officer had to force Thomas to the ground. *Id.* at 440–41. The officers found next to the door four individually wrapped bags of marijuana and four individually wrapped bags of crack cocaine prepackaged for sale. *Id.* at 441. Thomas had $120 on his person. *Id.* Henderson denied owning the drugs and said he ran to the bedroom to get his cell phone and prescription pills. *Id.* Thomas gave police officers a false name and said he could not remember his social security number. *Id.* Thomas eventually gave the officers his correct name and said he had given a false name because he was subject to an outstanding arrest warrant. *Id.* There actually was no outstanding arrest warrant for Thomas. *Id.* The jury convicted Thomas of possession with intent to deliver marijuana, crack cocaine, and related charges. *Id.* at 441–42.

We affirmed his convictions. *Id.* at 442, 447. We noted Thomas "did not own and was not in exclusive possession of the place where the drugs were found." *Id.* at 445. After surveying our caselaw, we concluded our holding "fit[] comfortably among our precedents where we have found the evidence sufficient to sustain a finding of guilt." *Id.* at 447. We noted "the drugs were found where Thomas had been holding

the door back from the police." *Id.* at 443. The only logical explanation for Thomas's actions was that he was buying time to empty his pockets of the narcotics. *Id.* Although Henderson also ran into the bedroom, he went to the opposite corner, away from the drugs and towards his personal effects. *Id.* at 443–44. Here, Reed lacked exclusive possession of the bedroom where the drugs were found, but he had been in the home overnight and departed only minutes before the search. Most of the drugs were found under large men's pants that presumably were Reed's.

Reed relies on *State v. Webb*, in which we held the evidence was insufficient to support a conviction for possession of marijuana found on the defendant's living room table and in his bedroom. 648 N.W.2d at 79–81. Police went to Webb's apartment in response to an anonymous complaint. *Id.* at 75. Webb was not present, but Webb's live-in girlfriend gave police permission to search for weapons. *Id.* The officers saw marijuana seeds and stems in plain sight in the living room, and Webb's girlfriend revoked her consent. *Id.* The police secured the premises and executed a search warrant later that day. *Id.* They found marijuana in a bedroom Webb shared with his girlfriend and more marijuana in the freezer. *Id.* No drugs were "found near or among Webb's personal belongings." *Id.* at 79. Webb arrived at the apartment several hours later, and police searched him. *Id.* at 75. The police found $336 in cash on him, but no drugs or drug paraphernalia. *Id.* Webb acted unconcerned throughout the encounter. *Id.* at 80.

We held the State failed to meet its burden to show Webb had constructive possession of the marijuana. *Id.* at 81. We found it was significant that the State failed to present evidence regarding when Webb had last been in the house and noted Webb made no incriminating

statements. *Id.* at 79–80. By contrast, here, the police found the drugs under what the jury could find were Reed's clothes in his shared bedroom minutes after he left the house.

In *State v. Kern*, we held the evidence was insufficient to convict the defendant of possessing marijuana discovered in a house shared with her boyfriend, who claimed the drugs were his alone. 831 N.W.2d at 161–62. We noted competing considerations at play in our constructive possession jurisprudence: "Convictions for possession of drugs should be possible under the law, even though the defendant is not caught 'red-handed,' but innocent bystanders in the wrong place at the wrong time must be protected from a conviction." *Id.* at 161. We found "no evidence that Kern was more than an agreeable bystander" to her boyfriend's grow operation. *Id.* at 162. By contrast, Buchanan acted suspiciously during the search but never claimed the drugs were hers, much less hers alone. Sufficient evidence tied Reed to the drugs, and the jury could find he was not "an innocent bystander[] in the wrong place at the wrong time." *See id.* at 161.

**B. Constructive Possession of the Firearms**. We reach a different conclusion as to the firearms. The jury found Reed guilty of possession of a firearm as a felon in violation of section 724.26 and possession of more than ten but less than fifty grams of cocaine base with intent to deliver while in possession or control of a firearm, in violation of section 124.401(1)(*e*). Both statutes require proof of actual or constructive possession. The felon-in-possession statute requires proof that an adjudicated felon has a firearm "knowingly . . . under the person's dominion and control or possession." Iowa Code § 724.26(1). "We have long held that 'dominion and control' may be shown by constructive, as well as actual, possession." *State v. Turner*, 630 N.W.2d

601, 609–10 (Iowa 2001) (reversing conviction under section 724.26). The firearm enhancement statute, section 124.401(1)(*e*), requires proof that the defendant had "immediate possession or immediate control" of a firearm. *State v. McDowell*, 622 N.W.2d 305, 307 (Iowa 2001). This may be proved by showing Reed had been "in such close proximity to the weapon as to claim immediate dominion over it" and that he had "knowledge of the presence of the firearm." *Id.* Such knowledge and control may be inferred if the firearm is found in a location under the defendant's exclusive control. *See id.* at 308 (citing *State v. Reeves*, 209 N.W.2d 18, 23 (Iowa 1973)). But here, the weapons were found in the bedroom shared with Buchanan. Accordingly, Reed's knowledge of the weapons and control over them "will not be inferred but must be established by proof. Such proof may consist either of evidence establishing actual knowledge by the accused, or . . . incriminating statements or [other] circumstances from which a jury might lawfully infer knowledge . . . ." *Reeves*, 209 N.W.2d at 22; *see McDowell*, 622 N.W.2d at 308. The State's evidence was insufficient to prove Reed's knowledge and control over the weapons.

The fingerprints recovered from the guns matched neither Reed nor Buchanan. *See Thomas*, 847 N.W.2d at 443 (noting constructive possession can be proved by defendant's fingerprints on the contraband). Moreover, while the guns were found in the same bedroom as the drugs, the drugs were under men's pants and the weapons were next to a woman's purse and a pink lotion bottle. Reed's cell phone had a photo of an assault rifle but not the handguns found in the bedroom. The handguns are not visible in Reed's cell phone photo showing the built-in with the cabinet doors closed.

In *McDowell*, we addressed a sufficiency-of-the-evidence challenge to a firearm enhancement under section 124.401(1)(*e*). 622 N.W.2d at 306. McDowell was a regular visitor at his girlfriend's house. *Id.* at 307. He sold cocaine to a confidential informant on two occasions from a bedroom there. *Id.* at 306. Police executed a search warrant and seized cocaine from the closet and kitchen table, as well as a police scanner, an electronic scale, and drug paraphernalia. *Id.* When the police entered, McDowell was in the bedroom where the two controlled buys had occurred. *Id.* That bedroom contained a letter addressed to McDowell and his girlfriend, as well as two weight conversion charts. *Id.* Next to those charts was a woman's purse containing a .22 caliber revolver. *Id.* McDowell was convicted of possession of cocaine with intent to distribute while in immediate possession or control of a firearm. *Id.* at 307. We held the State had failed to prove McDowell's possession of the firearm:

> The circumstantial evidence on which the State relies to establish defendant's knowledge of the firearm's presence all pertains to his frequent presence in Scott's home and his use of the northwest bedroom to sleep and conduct drug transactions. There is no evidence that defendant had ever accessed the purse belonging to Scott in which the firearm was contained. To the extent this evidence shows some dominion and control by defendant over various portions of Scott's residence, that dominion or control was certainly not exclusive. There is no evidence of the type credited in the *Reeves* case to establish his knowledge of or control over the firearm in Scott's purse.

*Id.* at 308. Similarly, Reed was a frequent visitor at the Randolph Street home, and the State presented sufficient evidence to show he constructively possessed the drugs kept in the bedroom shared with Buchanan. The drugs were found beneath what the jury could infer were Reed's pants, but the firearms with the fingerprints of a stranger were four feet away next to a woman's purse and pink lotion bottle,

presumably Buchanan's. The evidence linking Reed to the guns in that room is as attenuated as the evidence found insufficient in *McDowell.*

In *State v. Bash,* we held a defendant who shared a bedroom with her spouse did not have constructive possession over marijuana found there. 670 N.W.2d 135, 139 (Iowa 2003). Patricia Bash lived in an apartment with her husband and their three sons. *Id.* at 136. Police officers executed a search warrant for the premises, and Bash told them that any drugs found in the bedroom belonged to her husband. *Id.* The officers found marijuana in a box on her husband's nightstand and a bong on the floor on her husband's side of the bed. *Id.* The marijuana was surrounded by her husband's personal effects. *Id.* at 139. Bash knew her husband had kept marijuana in the box before but insisted marijuana was her husband's—not hers. *Id.* at 138–39. We held that "raw physical ability" to exercise control over the marijuana was insufficient to prove constructive possession. *Id.* at 139. Similarly, although Reed did not claim the handguns were Buchanan's, the weapons were found next to a woman's personal effects in the bedroom. As in *McDowell,* the evidence linking Reed to the guns in that room is as attenuated as the evidence found insufficient in *Bash.*

The jury could believe the officer's testimony that drug dealers typically have weapons to protect their drugs and cash. We conclude on this record, however, that the mere proximity of the firearms to the drugs is insufficient to prove Reed's constructive possession of the weapons. In *Parker v. State,* Maryland's highest court held such police testimony was insufficient to prove a drug dealer's possession of a weapon in the same house. 936 A.2d 862, 883–85 (Md. 2007). Parker was arrested in a house with nine vials of cocaine and three plastic bags of marijuana on his person. *Id.* at 865. In the second floor hallway, police discovered an

operable, loaded .357 magnum handgun. *Id.* Parker was convicted of several drug and weapon-related offenses and appealed. *Id.* at 865–66. The record was unclear regarding where in the house Parker was arrested, whether Parker lived there or merely visited, and whether the gun was in plain view. *Id.* at 885. The court summarized the State's argument and rejected it:

> The State also suggests that, because "guns are a tool of the drug trade," the amounts of drugs found on Parker's person and in the house "allow a reasonable inference of Parker's constructive possession of the handgun." The State cites no case or other authority that would support such an attenuated inference. . . .
>
> The "mere proximity to the [contraband], mere presence on the property where it is located, or mere association, without more, with the person who does control the . . . property on which it is found, is insufficient to support a finding of possession." Terrance Parker's degree of proximity to the handgun found on the second floor of 800 Belnord Avenue is unknown. Except for his presence in the house at the time of the search, Parker's connection to 800 Belnord Avenue is unclear. The evidence is totally insufficient to support an inference that Parker knowingly exercised dominion or control over the handgun.

*Id.* (alteration in original) (citations omitted) (quoting *Taylor v. State*, 697 A.2d 462, 466 (Md. 1997)); *see also United States v. Cunningham*, 517 F.3d 175, 179 (3d Cir. 2008) ("[A]lthough guns and drugs are often linked, the presence of one does not prove knowledge of the other."). The State cites no contrary authority linking firearms to narcotics nearby. On this record, we decline to conclude that proof of Reed's constructive possession of the drugs, without more, was sufficient to prove his constructive possession of the handguns with someone else's fingerprints found next to a woman's personal effects. *See McDowell,* 622 N.W.2d at 308.

We hold the evidence was insufficient to prove Reed's constructive possession of the firearms under Iowa Code sections 124.401(1)(*e*) or 724.26. The district court had applied the enhancement in section 124.401(1)(*e*) to double Reed's sentence for possession of cocaine with intent to deliver from twenty-five years in prison to fifty years. Reed must be resentenced "in the absence of a finding that defendant had immediate possession or control of a firearm." *McDowell,* 622 N.W.2d at 309.

### IV. Disposition.

We affirm the decision of the court of appeals rejecting Reed's claims that his trial counsel was ineffective and vacate that court's resolution of his remaining claims. We reverse the district court's judgment of conviction for possession of a firearm and resulting sentence enhancement under Iowa Code section 124.401(1)(*e*), as well as his conviction as a felon in possession of a firearm in violation of section 724.26. We affirm Reed's remaining convictions and remand the case for resentencing consistent with this opinion. We do not reach Reed's constitutional challenge to his original sentence.

**COURT OF APPEALS DECISION AFFIRMED IN PART AND VACATED IN PART; DISTRICT COURT JUDGMENT AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED FOR RESENTENCING.**

All justices concur except Hecht and Wiggins, JJ., who concur specially.

**HECHT, Justice (concurring specially).**

This court has followed a "cautious, but very sound, jurisprudential approach" when applying the doctrine of constructive possession. *State v. Thomas*, 847 N.W.2d 438, 451 (Iowa 2014) (Hecht, J., dissenting). As we explained in *State v. Reeves*:

> [W]here the accused has not been in exclusive possession of the premises but only in joint possession, knowledge of the presence of the substances on the premises and the ability to maintain control over them by the accused *will not be inferred* but must be established by proof. Such proof may consist either of evidence establishing actual knowledge by the accused, or evidence of incriminating statements or circumstances from which a jury might lawfully infer knowledge by the accused of the presence of the substances on the premises.

209 N.W.2d 18, 23 (Iowa 1973) (emphasis added). In following our cautious approach to the doctrine, we have noted that "when two reasonable inferences can be drawn from a piece of evidence, . . . such evidence only gives rise to a suspicion, and, without additional evidence, is insufficient to support guilt." *State v. Truesdell*, 679 N.W.2d 611, 618–19 (Iowa 2004); *accord State v. Schurman*, 205 N.W.2d 732, 734 (Iowa 1973) ("[T]he circumstances must be entirely consistent with defendant's guilt, [and] wholly inconsistent with any rational hypothesis of his innocence . . . ."). These limiting principles inform our role as "careful gatekeepers" whose responsibility it is to assure convictions are based on substantial evidence of proof beyond a reasonable doubt rather than suspicion. *Thomas*, 847 N.W.2d at 458.

I write separately to emphasize my conclusion that many of the facts the State cites in support of its contention that Reed constructively possessed the drugs seized from Buchanan's house raise more than one reasonable inference and they are therefore speculative when examined

individually. This conclusion is significant, in my view, because our cautious approach to the doctrine of constructive possession should not recognize a stack of speculative inferences piled one on top of another as substantial evidence that Reed constructively possessed the drugs beyond a reasonable doubt. *See id.* at 451–52 (asserting "we have required more than inference piled upon inference amounting ultimately to mere speculation" in constructive possession cases involving multiple occupants or residents of a dwelling). Put another way, I do not believe inferences based on speculation are transformed into substantial evidence when they are accumulated in a series with other speculative inferences.

The record clearly includes substantial evidence connecting Reed to the house in question. He was a frequent visitor there and sometimes stayed for several hours. He was observed entering the house without knocking, and he sometimes took out the trash. But as I noted in *Thomas*, "we have frequently maintained proof of access to a place where a substance is found cannot by itself support a finding of unlawful possession." *Id.* at 448. Thus, the substantial evidence of Reed's access to the house does not support an inference that he was a regular user or joint occupant of *the bedroom*—let alone a person who exercised dominion and control of the cocaine found there. *See State v. McDowell*, 622 N.W.2d 305, 308 (Iowa 2001) (concluding evidence of a defendant's frequent presence in a home did not necessarily demonstrate dominion and control over all items found inside it).

My colleagues are willing to infer that the pair of large men's pants on a pile of other garments in the bedroom were Reed's, and so was the cocaine found under them. The record reveals that Reed weighed 210 pounds. I think the evidence connecting Reed—as opposed to the other

men frequenting the house—to the pants is speculative at best. I leave room for the possibility on this record that Ramon Brumfield (whose identification card was found in the same room), or Chad Wolf (the owner of the house seen entering the house on the morning of the search), or any of the other men seen entering the house during the surveillance might also wear large pants. Furthermore, the pants concealing the cocaine were atop a pile of clothing that included a woman's garments. If we infer Buchanan's bedroom was jointly occupied by a man and a woman, the fact finder could only speculate that the man—not the woman—had dominion and control over the cocaine found between the man's pants and the woman's clothing.

My colleagues also find significant a rental agreement from the Rent-a-Center addressed to Reed and Buchanan and found in the bedroom. I do not find the agreement probative of Reed's dominion and control of the cocaine found in the bedroom because there is no evidence Reed signed or ratified the document and because it represented falsely that he was married to Buchanan.

My colleagues conclude Reed made incriminating statements after his arrest establishing his dominion and control over the drugs. I do not understand Reed's statements as an admission of his dominion and control over the drugs seized in the search of Buchanan's house. I understand the statements instead as a vague intimation that Reed and Buchanan could "help" police and as an expression of Reed's willingness to cooperate with law enforcement officers in furtherance of his desire to protect Buchanan—the mother of his child—from prosecution. Although I believe a fact finder could reasonably infer from Reed's statements that he knew Buchanan's house contained contraband, the statements standing alone were not in my view sufficient to support an inference

that he exercised dominion and control over the contraband. *See State v. Kern*, 831 N.W.2d 149, 162 (Iowa 2013) (concluding that knowledge of a vast marijuana growing operation in a house did not prove the defendant who jointly possessed the property had dominion and control over the marijuana); *cf. State v. Atkinson*, 620 N.W.2d 1, 5–6 (Iowa 2000) (concluding a passenger in a car did not exercise dominion and control over the driver's fanny pack, which she knew contained drugs, even though an officer observed her making furtive movements in the vehicle near where the fanny pack was discovered).

I also do not share my colleagues' willingness to infer that a photograph found on Reed's cell phone depicting a piece of furniture found in the bedroom is probative of Reed's dominion and control of the cocaine seized from that room during the search. Although this photograph might support an inference that Reed (or someone using his phone) might have had access to the room, in my view it does not support a fair inference that Reed regularly used the room or that he exercised dominion and control over the cocaine found there at the time of the search. Furthermore, even if the State adduced substantial evidence that Reed had joint access to Buchanan's bedroom, that fact surely would not be sufficient under our precedent to support a finding of his dominion and control over drugs found there. *See State v. Bash*, 670 N.W.2d 135, 139 (Iowa 2003) ("[T]he authority or right to maintain control includes something more than the 'raw physical ability' to exercise control over the . . . substance.").

Although I find many of the inferences credited by my colleagues are speculative and therefore not substantial evidence of Reed's dominion and control of the drugs, I nonetheless concur in the result here. I do so because I find inferences from Reed's phone records, photographs found

on his cell phone depicting what appears to be white powder on his face, and the significant amount of cash found on his person at the time of his arrest are minimally sufficient to constitute proof beyond a reasonable doubt that Reed exercised dominion and control over the cocaine seized during the search of the house. A reasonable fact finder could find the extraordinarily large volume of phone calls of brief duration made to and from the cell phone during a three-day period in close temporal proximity to the arrest was consistent with drug dealing by Reed. *See United States v. Samuels*, 611 F.3d 914, 918 (8th Cir. 2010) (concluding a defendant's "unusually high volume of calls . . . suggested his involvement in the drug trade"). The photographs of Reed with white powder about his face can also, in my view, reasonably support an inference that he had dominion and control of the cocaine found in the search of the bedroom of the house from which he departed minutes before the arrest. And although we have concluded a defendant's possession of $336 on his person was "too tenuous and speculative to support an inference of constructive possession" of an illegal substance seized in a search of his residence, *State v. Webb*, 648 N.W.2d 72, 80 (Iowa 2002), Reed had more than $500 on his person at the time of his arrest immediately after leaving Buchanan's house where the cocaine was seized. These facts support fair inferences that are based on "more than suspicion, speculation, or conjecture," *see State v. DeWitt*, 811 N.W.2d 460, 475 (Iowa 2012), and are therefore minimally sufficient to sustain a finding of Reed's dominion and control of the drugs. Accordingly, I concur in the result.

Wiggins, J., joins this special concurrence.