**STATE of Iowa, Appellee,**

v.

**Royal Nate WELLS, Appellant.**

No. 86–1802.

Supreme Court of Iowa.

March 22, 1989.

Charles L. Harrington, Appellate Defender, and B. John Burns, Asst. Appellate Defender, for appellant.

Thomas J. Miller, Atty. Gen., Bruce Kempkes, Asst. Atty. Gen., James Smith, County Atty., and Nan M. Horvat, Asst. County Atty., for appellee.

Considered by LARSON, P.J., and CARTER, LAVORATO, SNELL, and ANDREASEN, JJ.

SNELL, Justice.

On October 14, 1986, defendant, Royal Nathaniel Wells, was found guilty by a jury of three counts of attempted murder, in violation of Iowa Code section 707.11 (1985). He was subsequently sentenced to serve three consecutive terms of incarceration, each of which was not to exceed twenty-five years. Wells raised three issues on appeal: (1) whether the trial court erred by permitting identification testimony by a victim when the identification was allegedly based upon his dreams about the incident; (2) whether Wells was denied his constitutional right of confrontation by the State's use of deposition testimony; and (3) whether the trial court abused its discretion by overruling Wells' motion for mistrial based upon jury misconduct. We transferred the case to the court of appeals, which reversed Wells' conviction on the basis of the first issue and remanded for a new trial. The court of appeals did not address the latter two assignments of error. We then granted the State's application for further review. We vacate the decision of the court of appeals and affirm Wells' conviction.

On the evening of April 29, 1986, Alfred Gatewood, Wells' brother, was detained by two employees and a customer of a 7-Elev-

en store in Des Moines. Gatewood and two companions had attempted to walk out of the store with cartons of beer for which they had not paid. Although his companions successfully exited the store, Gatewood did not. While Tom McClure, one of the employees, telephoned the police, a man with a baseball bat approached the store from the car wash next door. He demanded that Gatewood be released. Todd Habick, the customer detaining Gatewood, complied with this demand when it appeared McClure and Steve Garity, the other employee, did not want any more trouble. Gatewood and the other man then walked across the parking lot to the car wash.

When the police arrived a few minutes later, the decision was made to patrol the immediate area with Habick, instead of McClure or Garity, because McClure did not want the store left under-staffed.

In the meantime, Gatewood ran into Wells, who was giving Lisa Harper and Renee Fletcher a ride to visit a prostitute to whom Fletcher wished to sell some clothes. After Gatewood told Wells about the trouble at the 7–Eleven, they decided to return to the store.

Wells parked his car at the car wash next door. Fletcher testified she saw Wells retrieve a handgun from near the driver's seat, cock it, and place it in the waistband of his pants. Harper also observed the gun in the car but she did not see Wells pick it up. Gatewood and Wells then went into the 7–Eleven; Fletcher stood by the car, watching them through the chain link fence separating the store and the car wash. It is not clear whether Harper also walked toward the store or stopped to talk to an acquaintance at the car wash.

Just after Gatewood entered the store, a fight began between him and Chris Christensen, a customer. Gatewood may also have been briefly fighting with McClure and Garity. In any event, McClure was pushed toward the back of the store by Wells and they began scuffling. This was observed by Leo Day, another customer. Day then observed Wells pull the gun out and shoot McClure in the chest. Wells then advanced toward the front of the store where Day and Garity were standing; Day was clutching two bottles of pop to potentially use as weapons and Garity was telephoning the police. Wells fired a number of shots at Garity, two of which hit him in the leg. One of these shots, or perhaps a third shot, hit one of Day's bottles of pop, causing it to explode. Day sustained fragmentation cuts from the flying glass.

Wells then went outside, where Gatewood was fighting with Christensen. He was observed by Fletcher, who had seen the fighting inside the store and had heard the shots fired. Wells pulled Gatewood away from Christensen and shot Christensen in the chest and abdomen.

Wells and Gatewood then returned to the car. They drove with Fletcher and Harper to where Fletcher lived. Fletcher testified that Wells appeared shocked and hysterical, and was saying he could not believe he had shot those people. Wells, Gatewood, and Harper all denied Wells made that statement.

Shortly thereafter, Wells fled Des Moines. He was apprehended approximately two weeks later in Omaha, Nebraska, and these proceedings followed.

I. *Garity Identification.* At trial, Steve Garity was allowed, over Wells' objection, to identify Wells as the man who shot him. At a pretrial deposition, Garity was unable to identify Wells as his assailant. However, at trial Garity testified that in the interim between the deposition and trial he had relived the shootings in his dreams five or six times. He stated he was now able to identify Wells because "when you see this guy in your dreams time and time again, you learn what he looks like." Wells objected to Garity's identification on the ground that it was not "based upon the facts and events of the occurrences." The trial court overruled this objection after Garity stated that his dreams factually accorded with his memory of the incident.

Iowa Rule of Evidence 602 provides:

A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter. Evidence to

prove personal knowledge may, but need not, consist of the testimony of the witness himself.

The burden of laying a foundation that demonstrates the witness has personal knowledge of the matter is upon the party offering the testimony. McCormick, *Evidence* § 10 (2d ed. 1972). *Cf. State v. Myers*, 382 N.W.2d 91, 93 (Iowa 1986) (burden is on proponent to establish admissibility of expert testimony).

We have previously outlined a three-part test for determining whether a witness is to be excluded because of a lack of testimonial qualification:

> First, it must be determined whether the witness has observed the incident about which he proposes to testify and has received some impressions which he seeks to relate in court; second, whether the witness has a recollection of those impressions resulting from his observation which fairly corresponds with or reproduces the original knowledge or observation; and third, whether he is able to communicate this recollection to the tribunal. In the absence of any one of these elements the witness's testimony cannot be believed.

*State v. Harvey*, 242 N.W.2d 330, 335 (Iowa 1976).

■ In this case, we are persuaded Garity's identification of Wells violated the second prong of this test. Although Garity stated his dreams accorded with his memory of the incident, it is apparent his original observations did not include more than general impressions regarding the assailant's height, weight, muscular build, and clothing. Garity's more specific impression that Wells was the assailant was not the product of a more detailed recollection, but was instead the product of Garity's dreams, which were likely influenced by his view of Wells at the deposition. Under these circumstances, we conclude the trial court abused its discretion by admitting Garity's testimony identifying Wells. *See State v. Groscost*, 355 N.W.2d 32, 39 (Iowa 1984); *State v. Whitfield*, 315 N.W.2d 753, 755 (Iowa 1982).

■ However, we do not believe this error requires reversal of Wells' conviction. We have frequently stated that the erroneous admission of evidence is not prejudicial where substantially the same evidence is elsewhere in the record without objection. *E.g., State v. Hood*, 346 N.W.2d 481, 484 (Iowa 1984); *State v. Holmes*, 325 N.W.2d 114, 116 (Iowa 1982); *State v. Jacoby*, 260 N.W.2d 828, 834 (Iowa 1977).

In this case, two other witnesses, Day and Fletcher, testified that Wells had a gun and was the shooter. Contrary to Wells' assertion, we find the testimony of these witnesses to be credible.

Day was face-to-face with Wells on three separate occasions during the shooting of McClure and Garity inside the store. To discount Day's identification of him, Wells relies on a statement made by Day that "most blacks look alike." The record reveals that this statement has been taken out of context. On cross-examination Day was asked:

> Did you tell me when I took your deposition, Mr. Day, that there might have been some problems in identifying the people in there because you had grown up with black people, you had worked with black people, you had served in Vietnam with black people, and black people all sort of look alike?

Day responded by saying:

> I made a statement that most blacks look alike but there are certain characteristics that you can key in on. Some have large cheekbones, might be that the hair —but you can't go by the hair all the time. That's why I went by the face. That has always been flashing right in front of me which I, you know, saw.

We do not believe this statement undermines Day's credibility. Throughout his testimony Day repeatedly referred to the fact that he focused on Wells' face and that he and Wells were only a few feet apart on several occasions. Day's identification of Wells was based primarily on his recollection of Wells' face.

Fletcher, an acquaintance of Wells, observed him leave the car with the gun, enter the store, and begin fighting. She

heard shots fired, and observed Wells leave the store with the gun and then shoot Christensen. To discount her identification, Wells relies on statements by Harper that Fletcher had been smoking cocaine all day. Fletcher admitted smoking cocaine after the shooting; in fact, the reason she asked Wells for a ride to sell some clothes was in order to obtain money for cocaine. However, Fletcher denied smoking cocaine before the shooting.

Fletcher's testimony appears far more credible than Harper's. For example, in regard to the shooting, Harper testified she had walked toward the 7–Eleven and saw "a lot of arguing going on. Then I heard about three or four shots and I kind of turned away and I saw the two guys fighting [Gatewood and Christensen] and I walked back to the car." Harper didn't see anybody fire the shots; instead, she thought somebody was shooting in the air. We think it unlikely Harper could have stood in the 7–Eleven parking lot, heard the shots fired which struck two people inside the store and one person outside the store, and not have seen anything.

We conclude the admission of Garity's identification of Wells was harmless.

II. *Gatewood Deposition.* Shortly after the shootings, Alfred Gatewood was arrested as a material witness, pursuant to Iowa Code section 804.11. After obtaining his release by posting a bond, Gatewood was deposed before trial by the State and Wells' attorney. A subpoena requiring him to appear at Wells' trial was served on him by the State at that deposition.

Gatewood failed to appear on the date provided by the subpoena. At the subsequent bond revocation hearing, Gatewood explained he did not appear because Wells had told him the trial would be continued. Gatewood was then informed by the court that he must disregard Wells' statements and, instead, follow the provisions of the subpoena and his bond. Because the court was satisfied Gatewood understood he must comply with the terms of his bond and the subpoena, his bond was not revoked. Wells' trial was continued, so another subpoena requiring Gatewood to ap-

pear on the new trial date was served on him by the State. The service of this subpoena apparently did not comply with the requirements of Iowa Rule of Criminal Procedure 14(3).

When Gatewood did not appear for a conference with the prosecution on the Friday before trial, a prosecutor contacted Gatewood's attorney and his bondsman. They did not know where he was. A prosecution investigator proceeded to check Gatewood's place of employment and his last known address. The investigator spoke with Gatewood's neighbors, fellow employees, and the foot patrol of the Des Moines police. The investigator finally obtained a warrant for Gatewood's arrest and broadcast his name over the state law enforcement computer system as being a wanted person.

Gatewood failed to appear the following Monday for the commencement of Wells' trial. The State therefore sought to read the transcript or play the tape of his deposition testimony to the jury. Wells objected, contending that the State had failed to meet its burden to show it made a good faith effort to produce Gatewood for trial, and that therefore the introduction of the deposition testimony would violate his constitutional right of confrontation.

Because a constitutional right is implicated, our review of the record on this issue is de novo. *State v. Holland,* 389 N.W.2d 375, 378 (Iowa 1986); *State v. Dean,* 332 N.W.2d 336, 338 (Iowa 1983).

■ For Confrontation Clause purposes, a witness is not unavailable "unless the prosecutorial authorities have made a good faith effort to obtain his presence at trial." *Holland,* 389 N.W.2d at 379 (quoting *Barber v. Page,* 390 U.S. 719, 724–25, 88 S.Ct. 1318, 1322, 20 L.Ed.2d 255, 260 (1968)). The lengths to which the State must go to produce a witness is a question of reasonableness. *Ohio v. Roberts,* 448 U.S. 56, 74, 100 S.Ct. 2531, 2543, 65 L.Ed.2d 597, 613 (1980). And the burden is on the State to establish this predicate for admissibility. *Id.* at 74–75, 100 S.Ct. at 2543, 65 L.Ed.2d at 613.

■ We are convinced the facts here demonstrate a good faith effort by the State to locate and present Gatewood. Contrary to Wells' assertion, we do not believe the procedural infirmities in the service of the second subpoena on Gatewood suggest the State did not seriously wish to compel Gatewood's attendance at trial. Nor do we believe Gatewood's failure to honor the first subpoena should have put the State on notice that he would not honor the second subpoena. Gatewood's explanation for his first failure, that Wells had told him the trial was continued, was reasonable, particularly given the fact that the trial actually was continued. To revoke Gatewood's bond under these circumstances would have been a harsh remedy with scant justification. The trial court was correct in allowing the tape of Gatewood's deposition testimony to be played to the jury.

■ III. *Juror Misconduct.* In the middle of Wells' trial, one juror, Raymond Michel, visited the 7–Eleven and the car wash next door. He reported this to another juror, John Orrell, who reported it to the trial court, as follows:

> [Y]esterday afternoon a juror approached me and said that, "You know, the State's diagram is way out of proportion and it's something that I was having trouble following so I went to the scene of the accident or I went to the 7–Eleven and looked around and I looked through the fence also and looked at the car wash and you know you can get a pretty good view from that area." This is essentially the substance of the conversation. I haven't quoted it. He then finished with, "I don't know if I should have done that," and I responded, "No, you shouldn't have."

The trial court then questioned the jurors individually and in private about whether they had visited the scene, or had obtained information regarding the trial from any media reports. Michel acknowledged that he had visited the scene and had discussed his observations with one other juror. Wells moved for a mistrial on the basis of this visit.

The trial court considered allowing the entire jury to view the scene; ironically, Wells' request that that be done had been previously denied by the court. Wells contended that a visit by the entire jury would not cure the taint caused by Michel's independent visit. The State had no objection to taking the jury to the scene, but it did not believe a visit was necessary and therefore declined to request that a visit be undertaken. Ultimately, no inspection of the scene was made by the jury. The trial court dismissed Orrell from the jury, because it appeared he had been prejudiced by his conversation with Michel. Michel was allowed to remain on the jury. The trial court overruled Wells' motion for mistrial and the case was submitted to the jury.

In *State v. Cullen*, 357 N.W.2d 24, 27 (Iowa 1984), we formulated a three-part test gleaned from our previous opinions that must be met to impeach a verdict on the basis of jury misconduct. First, the evidence from the jurors must consist only of objective facts as to what actually occurred in or out of the jury room bearing on misconduct. Second, the acts or statements complained of must exceed tolerable bounds of jury deliberation. Third, and finally, it must appear the misconduct was calculated to, and with reasonable probability did, influence the verdict. *Id.*

In *Ryan v. Arneson*, 422 N.W.2d 491, 495 (Iowa 1988), we revised the first prong of the *Cullen* test through an interpretation of Iowa Rule of Evidence 606(b). We determined that under this rule jurors are not competent to testify as to internal deliberations, even if those deliberations could be classified as objective. *Id.* Jurors are, of course, still competent to testify as to "whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror." Iowa R. of Evid. 606(b).

In this case, there is no dispute Michel's visit to the scene constituted misconduct. The issue is whether it was calculated to, and with reasonable probability did, influence the verdict. The trial court deter-

mined there was not a reasonable probability the verdict would be influenced.

In ruling on these matters, the trial court has broad discretion. *State v. Sauls*, 391 N.W.2d 239, 240 (Iowa 1986); *Cullen*, 357 N.W.2d at 27. We do not find an abuse of discretion unless the court's action was clearly unreasonable under the attendant circumstances. *Sauls*, 391 N.W.2d at 240; *State v. Harrington*, 349 N.W.2d 758, 761 (Iowa 1984).

We believe Michel's visit to the scene was calculated to influence the verdict, in that his observations buttressed the testimony of Renee Fletcher, the eyewitness outside the 7–Eleven. However, we agree with the trial court that there did not exist a reasonable probability that Michel's misconduct influenced the verdict. The only juror Michel related his observations to, Orrell, was dismissed from the jury and replaced by the alternate juror. There is no evidence, by way of post-verdict affidavits or otherwise, that Michel discussed the visit with any other juror, let alone that the visit was brought to the attention of the jury as a whole.

In *State v. Carey*, 165 N.W.2d 27 (Iowa 1969), the defendant's attorney moved for a mistrial when he saw a sign in the jury room stating "Coffee will be furnished in the jury room by the county clerk and the county attorney." The trial court overruled the motion on the ground that it was improbable that prejudice had resulted. In reversing, we emphasized that any practice which brings the jury's proceedings under suspicion is to be prohibited. *Id.* at 30. However, in *Cullen*, we distinguished the situation involved in *Carey*. In *Carey*, we were concerned with manipulation of the jury by outsiders; in *Cullen*, we were concerned only with the internal operation of the jury. *Cullen*, 357 N.W.2d at 28. We concluded only the former justifies a stricter rule designed to keep the jury deliberations above suspicion. *Id.* Similarly, in the case at bar we do not have a question of influence exerted by nonjury members which would call for the application of the stricter rule.

In *State v. Little*, 164 N.W.2d 81, 83 (Iowa 1969), we found the trial court did not abuse its discretion by overruling the defendant's motion for new trial, even though the visit to the scene of the crime by at least one juror was discussed in the jury room and tended to support the State's eyewitness's testimony. The circumstances in this case also do not rise to a prejudicial level of misconduct. We conclude the trial court did not abuse its discretion by overruling Wells' motion for mistrial.

DECISION OF COURT OF APPEALS VACATED; JUDGMENT OF DISTRICT COURT AFFIRMED.

All Justices concur except LARSON and CARTER, JJ., who concur in the result only.

LARSON, Justice (concurring specially).

I concur in the result but write separately because I disagree with the majority's conclusion that Garity's identification testimony should have been excluded on the ground it was the sole product of his dreams.

A witness's ability to identify a subject is frequently enhanced between the time of the event in question and the witness's in-court identification. This enhancement might be through viewing the defendant in photographs or lineups or simply through concentrated thought about the event. We have nevertheless allowed the testimony to be admitted. Here, Garity's ability to identify Wells was apparently enhanced by recurring dreams. I do not believe this rendered the testimony inadmissible but should, as in the case of enhanced recollection through other means, only go to its weight.

CARTER, J., joins this special concurrence.