# IN THE COURT OF APPEALS OF IOWA

No. 15-0855
Filed September 14, 2016

**STATE OF IOWA,**
　　　　Plaintiff-Appellee,

**vs.**

**DEANDREW D. HARRIS,**
　　　　Defendant-Appellant.
_____

　　　　Appeal from the Iowa District Court for Black Hawk County, George L. Stigler (motion to suppress) and Kellyann M. Lekar (trial), Judges.


　　　　DeAndrew Harris appeals from his convictions and sentences for first-degree robbery, first-degree burglary, and felon in possession of a firearm as an habitual offender following a jury trial.　**AFFIRMED.**


　　　　Mark C. Smith, State Appellate Defender, and Robert P. Ranschau, Assistant Appellate Defender, for appellant.

　　　　Thomas J. Miller, Attorney General, and Timothy M. Hau, Assistant Attorney General, for appellee.


　　　　Considered by Doyle, P.J., Tabor, J., and Goodhue, S.J.*

　　　　*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2015).

**DOYLE, Presiding Judge.**

DeAndrew Harris appeals from his convictions and sentences for first-degree robbery, first-degree burglary, and felon in possession of a firearm as an habitual offender following a jury trial. He asserts the district court erred in admitting certain evidence and the jury's verdict was not supported by substantial evidence. We affirm.

### I. Background Facts and Proceedings.

"Viewing the trial evidence in the light most favorable to the jury's guilty verdicts," *State v. Romer*, 832 N.W.2d 169, 172-73 (Iowa 2013), the jury could have found the following facts: In the late hours of August 19, 2012, Namho Kye reported to law enforcement that five black males had just robbed him and his four friends at his apartment. Kye told the responding police officer that he

> and his friends were just sitting around playing cards and video games and listening to music and . . . things, and he said he had his wooden door open to the apartment and so there was just a screen door, and he said the screen door opened and a male walked through with a shotgun, a long gun, with a wooden stock on it. They could describe it, and . . . they said that that male was shorter, stockier, had a short Afro, in his twenties maybe. And then he said the next person through that he saw was a heavier set male with really shorthair, and then he described what he looked like, and then he stated that the third guy through was a male with dreads[1] that were very distinct because they had about one to two inches of red dye on the end and he had . . . a silver handgun.

---

[1] "Dreads" or "dreadlocks" refer to a hairstyle in which sections of hair are "permanently locked together and cannot be unlocked without cutting." Shauntae Brown White, *Releasing the Pursuit of Bouncin' and Behavin' Hair: Natural Hair as an Afrocentric Feminist Aesthetic for Beauty*, 1 Int'l J. Media & Cultural Pol. 295, 296 n.3 (2005). Such hairstyles are "worn predominately (albeit not exclusively) by Blacks and do not require the individual to alter his or her natural hair texture through the use of chemical agents." Devin D. Collier, *Don't Get It Twisted: Why Employer Hairstyle Prohibitions Are Racially Discriminatory*, 9 Hastings Race & Poverty L.J. 33, 34 n.2 (Winter 2012). Although the term "dreadlocks" is pervasive in popular culture, it originates from the slave trade; [w]hen Africans emerged from the slave ships after months spent in conditions adverse to any personal hygiene, Whites would declare the matted hair that had grown out of

Within hours of the robbery, the five victims were separately shown photo lineups created by an officer. Each lineup was comprised of six 4-by-5-inch pictures that were printed in color on separate pages. The lineup that contained Harris's picture included the photos of five other African-American men whose hair was worn in locks, none of whom were suspects. Four of the five victims identified the picture of Harris—photo number four—as one of the intruders. The one victim that did not identify Harris's photo in the lineup did not identify anyone in the lineup.

Harris was subsequently arrested and charged. Harris filed notice he was presenting an alibi defense, naming Mico Lovelady as one of his alibi witnesses. Lovelady was also suspected to be one of the five intruders along with Harris, and four of the five victims had identified Lovelady as one of the intruders in a different photo lineup.

Prior to trial, Harris filed a motion to suppress any statements by the victims identifying Harris in the photo lineup. He asserted the photo lineup containing his picture and the "procedure used in presenting the [lineup] to [the victims] was suggestive and therefore, unreliable." Specifically, he claimed the photo of him used in the lineup showed color in his locks, unlike the other men's locks, which were uniformly black in color. The court denied the motion.

---

their kinky unattended locks to be 'dreadful.'" Ayana D. Byrd & Lori L. Tharps, Hair Story: Untangling the Roots of Black Hair in America 104-06 (2001). Because of this negative connotation, "loc" or "lock" is preferred over the term "dreadlock." See Angela Onwuachi-Willig, *Another Hair Piece: Exploring New Strands of Analysis Under Title VII*, 98 Geo. L.J. 1079, 1081 n.2 (April 2010). Therefore, we will refer to this style throughout the body of this opinion as "locks."

The matter proceeded to trial in December 2014. By that time, Kye had moved to South Korea. The State requested a reading of Kye's deposition at the trial because he was unavailable to testify, and Harris objected. The court found Kye was unavailable as defined in Iowa Rule of Evidence 5.804 and that his testimony given via deposition should be allowed to be read into the record.

Lovelady testified in Harris's defense, stating he had been with Harris the entire night of the robbery. He testified he was with Harris at Harris's home, and they left around 6:30 or 7:00 p.m. to go to a friend's house. He testified they stayed there until around 2 a.m. the next morning, and they then returned to Harris's home for the night. In rebuttal, the State called the officer involved in the photo lineup containing Lovelady's photo, who testified, over Harris's objection, that four of the five victims had identified Lovelady as one of the intruders in the robbery.

The jury found Harris guilty as charged. Harris now appeals.

**II. Discussion.**

On appeal, Harris contends the district court erred in three respects. Specifically, he asserts the court should have: (1) granted his motion to suppress because the lineup was "impermissibly suggestive," (2) denied the State's request to admit Kye's deposition testimony into the record, and (3) sustained his objection to the officer's testimony concerning Lovelady's photo lineup and subsequent identification. Harris also challenges the sufficiency of the evidence to support the jury's verdict.

### A. *Motion to Suppress.*

"When unnecessarily suggestive pretrial out-of-court identification procedures conducive to mistaken identification that are incapable of repair are used, the Due Process Clause requires exclusion of the testimony of the identification." *State v. Folkerts*, 703 N.W.2d 761, 763 (Iowa 2005). Reviewing the record de novo, we must first determine "whether the identification procedure was in fact impermissibly suggestive." *Id.* at 764. Only then do we proceed in the second step of the analysis—determining whether, under the totality of the circumstances, an identification made by the witness is irreparably tainted. *See id.* Here, we need go no further than the first step, because the underlying basis for Harris's argument—that his picture in the lineup showed red-tipped locks—is simply not supported by the record.

At the hearing on the motion to suppress, the officer that prepared the photographic lineup first testified that none of the individuals in the photographs had red-tipped locks. After he was pressed on the issue, the officer acknowledged that it did appear that there was "some" color in the photo, but he clarified that the color in the tips of Harris's locks was "not very distinguishable" and could be "mistaken as a photo flash." In denying Harris's motion to suppress, the court found that "[i]f one looks really closely at [the photo of Harris in the lineup], one can see that the tips of the dreadlocks . . . do have some sort of coloration to it. This coloration does not immediately stand out, but [it] is observable if one pays close attention to the photograph."

Harris's booking photo revealed Harris had very distinctive locks at that time—layered, shoulder-length locks that were black at their roots to about the

middle of each lock, transitioning to a pinkish-red, before turning a bright, Raggedy-Ann red at the tips. There is a striking contrast between the booking photo and the lineup photo. The photo of Harris used in the lineup was an older photo, which also showed layered locks, but if Harris's locks were red-tipped at the time, the red is not readily apparent in the photo. Upon our de novo review, we find nothing about the color of Harris's locks in the lineup photo to be impermissibly suggestive. We affirm the court's ruling on this issue.

### B. *Deposition Testimony*.

Harris argues the court erred in allowing Kye's deposition to be read into the record. Specifically, he asserts Kye should not have been declared unavailable to testify because "the State did not make a good faith effort to obtain [Kye's] testimony for trial." Though we generally review a district court's decision to admit or exclude evidence for an abuse of discretion, we review hearsay claims, including whether a hearsay exception applies, for correction of errors at law. *See State v. Paredes*, 775 N.W.2d 554, 560 (Iowa 2009).

As an exception to the hearsay rule, Iowa Rule of Evidence 5.804(b)(1) provides for the admission of a deposition of an unavailable witness if the party against whom the testimony is offered had an opportunity and similar motives to develop the testimony by direct, cross, or redirect examination. Rule 5.804(a)(5) defines a witness as unavailable when the witness "[i]s absent from the trial . . . and the proponent of a statement has been unable to procure the declarant's attendance by process or other reasonable means." Thus, the State, as the proponent of the hearsay evidence, had the burden to establish Kye was unavailable and that it used diligence in trying to find him. *See State v.*

*Zaehringer*, 325 N.W.2d 754, 759 (Iowa 1982). "[D]ue diligence requires more than the issuance of a subpoena and the return of it not found." *State v. Dean*, 332 N.W.2d 336, 339 (Iowa 1983). Yet, the lengths to which the State must go to produce a witness are not without limits; the ultimate question is one of reasonableness. *See State v. Wells*, 437 N.W.2d 575, 579 (Iowa 1989).

We are convinced the facts demonstrate a good faith effort by the State to locate and present Kye for trial. At the beginning of Harris's trial, the State explained the extent of its attempt to procure Kye's attendance:

> [Kye] lived at the apartment for . . . four to six weeks before the incident occurred, [and he] lived there for a short time afterward before he moved to Cedar Falls to live with his parents . . . . He was served at his [parents'] address for the taking of his deposition [in November 2012]. . . . He was deposed . . . by prior [defense] counsel . . . regarding his knowledge regarding this incident. We expected him to be present [for trial]. As the court is certainly well aware, this case got old for . . . a various number of reasons. When we went to serve [Kye] his subpoena this most recent time, we sent a number of investigators with the Waterloo Police Department out to find him including [a] sergeant with the Investigative Unit. [Two other investigators were] involved in trying to track [Kye] down. They went to [Kye's parents' residence]. He does not live there anymore. No one from his family lives at that address anymore. My understanding, the tenants did not know these people at all. [The investigators] attempted to track [Kye] down through his—what we had, his existing phone numbers. Those phone numbers are no longer valid. They do not work. . . . They did make contact with some of his associates, some of his friends. Frankly, they asked all of the other witnesses in this case if they knew where [Kye] was, and [the investigators] were told . . . that that relationship sort of fell apart pretty quickly after this incident. They don't know where he is. They did track down a number of [Kye's] friends through Facebook and did receive confirmation from at least a couple of his Facebook friends that in April of this year, he returned with his family to Seoul, South Korea, where they believe [Kye] was beginning his two-year stint in the Korean Army, which was a mandatory two-year stint.
> . . . .
> We attempted to contact [Kye] through [Kye's] Facebook page and didn't receive any kind of response. We're not even sure

> if he has access to that account any longer. . . . We have not heard from him. We do not have an address if we could send him a subpoena in South Korea anyway, but we don't have an address or phone number to contact him at. So he certainly is unavailable for service of a subpoena. . . .
>
> . . . .
>
> . . . It is pretty apparent he is not in our country any longer, and even if we could find an address, we've been told it's a two-year mandatory stint. They probably wouldn't let him come in in any event. . . .

It is true, as Harris points out, the State did not attempt "to contact the government or army of South Korea" to compel Kye's attendance at trial. Nevertheless, that the State did not do more to locate him does not compel the conclusion that its efforts were unreasonable. As the Supreme Court has observed, it is always possible to think of additional steps the State might have taken to secure the witness's presence, but it is not required "to exhaust every avenue of inquiry, no matter how unpromising." *Hardy v. Cross*, 132 S. Ct. 490, 495 (2011). The law simply "does not require the doing of a futile act." *Ohio v. Roberts*, 448 U.S. 56, 74 (1980); *see also United States v. Winn*, 767 F.2d 527, 530 (9th Cir. 1985) (concluding that illegal aliens previously returned to Mexico were unavailable). If it was greatly improbable that a given measure would have resulted in locating the witness and producing him at trial—and we think that is the case here—it cannot be said that reasonableness required the State to employ that measure. *See, e.g.*, *Hardy*, 132 S. Ct. at 494; *Roberts*, 448 U.S. at 76; *see also Ambriz-Rivera v. Mukasey*, 270 F. App'x 717, 720-21 (9th Cir. 2008) ("To rely on the fantasy that a witness will return to testify simply because she is 'requested' to do so is not the reasonable effort to secure the witnesses' presence that due process requires."); *United States v. Pena-Gutierrez*, 222 F.3d

1080, 1088 (9th Cir. 2000) ("[W]hen the government has 'no addresses or any other information that would help locate' the deported aliens, 'it [i]s reasonable for the government to make no effort to find the . . . aliens.'" (citations omitted)).  We agree with the district court that the State established Kye was unavailable to testify as contemplated by rule 5.804 and affirm on this issue.

### C.  Rebuttal Hearsay Testimony.

Harris next argues the rebuttal testimony of the officer—that four of the five victims identified Lovelady as one of the intruders in the robbery—was inadmissible hearsay.  He notes the purpose of the officer's testimony was to imply Lovelady was also involved in the robbery, "thereby damaging [Harris's] alibi evidence."  Again, our review is for correction of errors at law.  *See State v. Musser*, 721 N.W.2d 734, 751 (Iowa 2006).  Though the district court did not elaborate on its reasons for overruling the hearsay objection, we "affirm a ruling which admits evidence over a hearsay objection on any proper ground appearing in the record, even if it was not raised below."  *State v. Weaver*, 608 N.W.2d 797, 805 (Iowa 2000).

Hearsay is an out-of-court statement offered in evidence to prove the truth of the matter asserted.  Iowa R. Evid. 5.801(c); *Musser*, 721 N.W.2d at 751.  However, a prior statement by a witness is not hearsay if "[t]he declarant testifies at trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . one of identification of a person made after perceiving him."  Iowa R. Evid. 5.801(d)(1)(c).  Three of the victims that identified Lovelady in the lineup testified at trial and were subject to cross-examination.  Kye's deposition, where he had been subject to cross-examination concerning his

identification in the photo lineups, was also admitted as testimony. Consequently, the statement was admissible under rule 5.801(d)(1)(c). *See State v. Mann*, 512 N.W.2d 528, 535 (Iowa 1994) (finding that an officer's testimony concerning the victim's identification was not hearsay and therefore admissible); *see also* 7 Laurie Kraky Doré, *Iowa Practice Series: Evidence*, § 5.801:8 (2015) (noting rule 5.801(d)(1)(c) "imposes no limits on the type of out-of-court identification statement that will be admissible. The 'perceiving' of the individual identified can be the result of a line-up, on-scene identification, photograph or photographic array, or a chance or previously arranged encounter"). Consequently, the district court did not err in denying Harris's hearsay objection.

### D. Sufficiency of Evidence.

Harris also challenges the sufficiency of the evidence to support his conviction. Our review is for correction of errors at law. *See State v. Reed*, 875 N.W.2d 693, 704 (Iowa 2016). Viewing all of the record evidence in the light most favorable to the State, "including all reasonable inferences that may be fairly drawn from the evidence," we will not disturb a verdict that is supported by "substantial record evidence." *Id.* "Substantial evidence" is evidence from which a reasonable jury could conclude, beyond a reasonable doubt, that the defendant is guilty. *See id.* at 704-05. Moreover, it is for the jury to determine the credibility of the evidence, and it may credit some evidence over other evidence or reject the evidence altogether. *See id.* at 705.

Examining the evidence in the light most favorable to the State, we find the verdict is supported by substantial record evidence. Among other things, cell

phones were taken by the intruders. All of the victims remembered one intruder had red-tipped locks and was holding a small silver gun. Four of the five victims identified Harris—even without bright red locks—in the photo lineup. A small silver gun was found with the victims' stolen phones, and Harris's DNA was found on that gun. Finally, Harris's alibi was questionable, and it was for the jury to determine whether or not Harris's alibi witness was credible. *See id.* Here, we find substantial evidence supported the jury's verdict.

### III. Conclusion.

Because we conclude the district court did not err in admitting the challenged evidence and the jury's verdict was supported by substantial evidence, we affirm Harris's convictions and sentences.

**AFFIRMED.**