PER CURIAM.
Lee Samuel Christensen shot a young man who was seeing a woman he once dated. The State charged Christensen with first-degree murder. The defense conceded Christensen was the shooter but argued he acted out of passion, warranting a verdict of voluntary manslaughter, the second of three lesser-included offenses. A jury found him guilty of second-degree murder, the first of the three lesser-included offenses.
On appeal, Christensen raises several issues. We find dispositive his claim of juror misconduct based on the introduction of extraneous information into jury deliberations.
I. Juror Misconduct
Background Proceedings . The proceedings leading up to the claim of juror misconduct are as follows. During the six-day trial, the district court repeatedly admonished the jurors "not to converse among" themselves "or with anyone else on any subject connected with this case." They were also instructed not to "allow anyone to speak with" them "about this case." If someone did, they were to "walk away and ... not listen." If a person persisted in talking to them or in their presence, the court instructed the jurors to "report it immediately" to the clerk or to the court. The jurors' phones were taken away during deliberations. The jurors were "admonished not to listen to, view, or read any form of media while this case is in progress." They were told, "This includes ... the full gamut of social media, the internet, cell phone communications, Instagram, Twitter." They were instructed not to "report to anybody on Facebook or any of those [social media] that" they had "been selected as a juror" to avoid inadvertently receiving something they were "not supposed to have." Finally, the court stated, "Our goal here is to have this case decided strictly upon the evidence and testimony presented at trial. So we do not want you to see any outside information that's not presented here."
At the conclusion of trial, the district court reminded the jurors, "You may not communicate about this case before reaching your verdict. This includes cell phones, and electronic media such as text messages, Facebook, MySpace, LinkedIn, YouTube, Twitter, email, etc."
Several jurors disregarded these admonitions. After the jury announced its verdict, Christensen moved for a new trial. He asserted:
During deliberations, the jury was exposed to and influenced by extraneous social media information which was considered by the jurors during the deliberative process. This act exceeded the tolerable bounds of jury deliberation and appeared calculated to, and with reasonable probability did, influence the jury's verdict.
Christensen claimed his "rights under the constitutions of the United States and the State of Iowa to a fair trial and due process of law were violated for all the reasons urged above." Christensen simultaneously moved to poll the jury. The district court granted the motion to poll.
Following a hearing, the court denied the new trial motion. The court began by conceding the jury received unauthorized information:
The testimony from the majority of jurors during the post-trial hearing confirms they were made aware of extraneous information concerning the possibility of a riot or some other sort of public disturbance or violence occurring if the jury did not find Christensen guilty of something.
Turning to whether the information was prejudicial, the court stated, "[S]uch information, if actually considered by the jury during their deliberations, would certainly be prejudicial." But, in the court's view,
While there [was] some testimony suggesting that the extraneous information about the possibility of a public disturbance, a riot, or public violence was brought to light prior to them reaching their verdict, the greater preponderance of the evidence establishes that it was not until after the jury had reached their verdict that such evidence was discussed.
The court concluded, "[T]he jury could not have exceeded the tolerable bounds of their deliberations."
On appeal, Christensen argues, "There can be no doubt that the exposure of one or more jurors to Facebook postings or conversations with family members about the possibility of a riot or danger to the jurors in the event Christensen was not found guilty of murder constitutes misconduct." He asserts the misconduct "was calculated to, and with reasonable probability did, influence the verdict."
Standard of Review. In State v. Webster , 865 N.W.2d 223 (Iowa 2015), the defendant filed a new trial motion raising a rule-based claim as well as a constitutionally-grounded claim of juror misconduct and bias. The district court denied the motion. Webster , 865 N.W.2d at 230. On appeal, the court acknowledged constitutional claims trigger de novo review, but concluded the defendant waived the constitutional claim and review was for an abuse of discretion. Id. at 231 n.4, 232. Given the posture of the case and the court's "general[ ] agree[ment] with the fact-finding of the district court," the court declined to decide "the proper standard of review regarding fact-finding by the district court in the context of a motion for a new trial." Id. at 231 n.4.
We are faced with the same procedural posture. The district court denied the misconduct/bias ground for a new trial under Iowa Rule of Criminal Procedure 2.24(2)(b)(2) (2015). The court also cited rule 2.24(2)(b)(9), permitting a court to grant a new trial if the defendant has not received a fair and impartial trial, but did not address the constitutional claim of juror misconduct. Accordingly, our review of the district court's ultimate conclusion on Christensen's new trial motion is for an abuse of discretion.
That said, we are faced with the question the Webster court was able to avoid-the standard of review of district court fact-findings-because, unlike the court in Webster , we disagree with the district court's key fact-findings supporting the ruling. The rule-based claim of juror misconduct is grounded in the constitution and, specifically, a defendant's right to a fair trial. See Iowa Rs. Crim. P. 2.24(2)(b)(9); 2.24(2)(b)(3) (authorizing a new trial where "the jury ... ha[s] been guilty of any misconduct tending to prevent a fair and just consideration of the case"); State v. Weitzel , 905 N.W.2d 397, 403 (Iowa 2017) (declining to "strictly demarcate a clear line between rule-based and due-process claims"). Although Christensen waived his constitutional claim, we believe the constitutional undergirding of the rule and the district court's reliance on the rule requiring a fair and impartial trial mandate de novo review of the fact findings. We proceed to the merits.
Rule 2.24(2)(b). Rule 2.24(2)(b)(2) permits a new trial if "the jury has received any evidence ... not authorized by the court." Iowa R. Crim. P. 2.24(2)(b)(2). Receipt of this type of evidence constitutes misconduct. See Webster , 865 N.W.2d at 235 ("There can be no question that communications with third parties about the merits of a case outside the confines of jury deliberations is a species of misconduct."); id. at 232 ("Juror misconduct ordinarily relates to actions of a juror, often contrary to the court's instructions or admonitions, which impair the integrity of the fact finding process at trial."); State v. Johnson , 445 N.W.2d 337, 342 (Iowa 1989) ("[I]ntroduction of additional, outside information is beyond permissible bounds."), overruled on other grounds by State v. Hill , 878 N.W.2d 269 (Iowa 2016) ; see also Iowa R. Evid. 5.606(b) (allowing a juror to testify about whether "[e]xtraneous prejudicial information was improperly brought to the jury's attention"). But "[w]e have consistently held misconduct with respect to the jury ... will not be grounds for a new trial unless prejudice is shown." State v. Carey , 165 N.W.2d 27, 29 (Iowa 1969). We turn to the record on juror misconduct.
Pre-Deliberaton Facebook Contact. Before deliberations began, a juror reported she logged onto Facebook during a lunchbreak and noticed Christensen's relative was listed on her profile as one of several top friends. She advised the court she met the relative on a "girls' weekend trip" three years earlier and they became Facebook friends. She denied routine contact with the relative and denied having any conversation with her about the case. She stated the contact would not prevent her from being a fair and impartial juror in the case. The district court decided to keep the juror on the jury.
The juror did not receive extraneous information. But the contact highlighted jurors' blatant disregard of the district court's unambiguous admonition to refrain from the use of social media during the trial. See Webster , 865 N.W.2d at 239 (disapproving of a juror's click of the "like" button on a comment by the victim's stepmother).
Post-Deliberation Extraneous Information . Several jurors reported gaining access to extraneous information after they began deliberating. This information is the crux of the misconduct claim.
One juror was asked,
[B]efore you and the other jurors reached your verdict and announced it in the courtroom, did you hear or see any comments from news media, from social media, from comments in the community, among friends, people that you know that there might be some sort of public disturbance or riot or public violence if a certain verdict wasn't reached in Mr. Christensen's case?
The juror responded, "I didn't see it, but I did hear in the jury room that some people had seen it on Facebook." He described the people as "two female jurors." When asked if "the other jurors" said "specifically what they heard or saw," he said, "I think what specifically came up is that there were some threats against the jury depending on what-whatever decision was made." The women "just said that there are people threatening the jury." Although this juror could not say the threats were "dependent on what specific decision was made by the jury," he stated the threats "had an impact on ... the jury feeling safe" and "upon reaching a verdict, there was a decision made to ask for a police presence as we walked to our cars to make sure we were safe." While, in his view, the discussion "wasn't part of our proceedings at all ... as far as the decision we reached," he admitted the discussion took place "prior to" the announcement of the decision in open court.
A second juror, asked the same question by defense counsel, began by stating she did not learn of extraneous comments about a riot or public disturbance or violence if a certain verdict was not reached until "after the decision was made" and they "were escorted out." However, on further questioning, she said the information was mentioned "a few days" before the jurors came into the courtroom to announce their verdict, "[d]uring the time [they] were in the jury room." She agreed the information referenced in the question "was mentioned to all of us" and the person who mentioned it "had been told that it was all over Facebook."
A third juror stated, "I did hear someone say something about that, but I don't know who." She did not recall the time line. Later, she explained, "I think someone just said that they heard that if we didn't vote for first degree murder that there was going to be-people were going to be mad or be outside the courthouse, something to that effect."
A fourth juror seconded the third juror's comments. When asked what she recalled being brought up in the jury room, she said, "Just that someone had told them that if it wasn't first degree that there would be a riot." She stated the comment was made after the jury reached a verdict but before it was announced in the courtroom.
A fifth juror said a person was told there was something on Facebook, but she heard the comment after the verdict was announced and after they returned to the jury room, but before they left the courthouse.
A sixth juror said there was a concern for the safety of jurors, but he did not remember "if it was after the verdict or before." He said "most people raised their hands" when asked if they were worried about their safety. He attributed the concern to the "highly charged," "emotional pressure" in the jury room.
A seventh juror agreed she heard other jurors in the jury room say they heard or saw something about possible violence based on what the verdict might be. She said, "There was just a comment made that there might be, like a possible riot at the courthouse." She said the comment was made before they came in to announce the verdict. She stated one juror made the comment and it was based on a call she received.
An eighth juror described a "very emotional" juror who heard there would possibly be a riot. The juror said the comment was made after the verdict was announced in open court.
In sum, eight of the twelve jurors said they received extraneous information relating to the outcome of the case in the jury room, after they began deliberating.
A ninth juror said she heard "there had been talk about a riot if [Christensen] wasn't found guilty." She said she heard it out in the public somewhere while the trial was still going on but did not recall that it was discussed in the jury room. The juror appeared to have heard the information outside the jury room. In Webster, the court found a juror "confronted with brief conclusory statements by third parties," who "did not engage in an extended conversation on the merits of the case," did not commit misconduct. 865 N.W.2d at 235. Accordingly, we do not count her in the final tally of jurors who received extraneous information during jury deliberations. However, we do count her in the tally of jurors who received extraneous information.
The information received by the jurors came from sources explicitly prohibited by the court's admonition. No juror reported these violations to the clerk or to the judge.[1] We conclude the eight jurors' receipt of extraneous information during deliberations amounted to juror misconduct. See Webster , 865 N.W.2d at 235. The jurors violated rule 2.24(2)(b)(2). The district court did not abuse its discretion in reaching the same conclusion.[2]
Prejudice. The general prejudice standard in the juror misconduct context has been framed as follows: "[I]t must appear the misconduct was calculated to, and with reasonable probability did, influence the verdict." Cullen , 357 N.W.2d at 27, partially abrogated by Ryan , 422 N.W.2d at 495 ; see also Webster , 865 N.W.2d at 235-36 (applying the Cullen prejudice standard). However, in Cullen , the court also discussed another prejudice standard. See Cullen , 357 N.W.2d at 28. After distinguishing between the internal operations of the jury and "manipulation of the jury by outsiders," the court stated, the manipulation scenario "justif[ied] a stricter rule, designed to keep the jury above suspicion." Id. ; see also State v. Wells , 437 N.W.2d 575, 581 (Iowa 1989) ("[W]e do not have a question of influence exerted by nonjury members which would call for the application of the stricter rule.")
In Carey , 165 N.W.2d at 29, the court characterized the stricter rule as "equally well-established." The court stated, "[T]he jury is to be above suspicion and that any practice which brings its proceedings under suspicion is to be prohibited." Carey , 165 N.W.2d at 29. There, the outside influence was a sign placed by the bailiff outside the jury room stating, "Coffee will be furnished in the jury room by the county clerk and the county attorney." Id. at 28. The Iowa Supreme Court began by acknowledging the absence of a contention that "any juror here was corrupted for the price of a cup of coffee." Id. at 29. But the court stated, "[W]e along with all courts have zealously guarded the utter independence of jurors." Id. ; see also Omaha Bank for Coops. v. Siouxland Cattle Coop. , 305 N.W.2d 458, 461-63 (Iowa 1981) (concluding claim needed to be "retried to 'zealously (guard) the utter independence of jurors,' " where a jury foreman bought drinks for lawyers representing a party). The court continued, "[O]ur concern is with the implication that attaches to the administration of justice under these circumstances." Carey , 165 N.W.2d at 30 (quoting Daniels v. Bloomquist , 138 N.W.2d 868, 872 (Iowa 1965) ). The court stressed the importance of public confidence in our jury system, stating:
In order that the institution of jury trials be preserved and its usefulness continued, its deliberations and pronouncements must be kept pure, and untainted, not only from all improper influences, But from the appearance thereof. It is often said that the jury is one of the bulwarks of our liberty, but it will remain so only as long as public confidence in the institution prevails.
Id. (quoting Daniels , 138 N.W.2d at 872 ). This was particularly true "in a criminal trial." Id . The court held the outside influence justified a new trial because "all attempts to ingratiate one side or the other with the jury must be prevented." Id.
We have no trouble concluding Christensen would be entitled to a new trial under Carey's stricter rule. The threat of a public disturbance if jurors did not find Christensen guilty[3] was known by jurors at or before the time the verdict became final. Most of the jurors were so concerned about their safety that they asked for additional security. The integrity of their deliberative process was impugned.
That said, our courts have not always applied the stricter rule to the introduction of external information designed to manipulate a jury. See, e.g. , Webster , 865 N.W.2d at 235-36 (applying Cullen standard to juror's conversation with a third-party); State v. Anderson , 448 N.W.2d 32, 34-35 (Iowa 1989) (citing Carey for the proposition that "conduct by an outsider, improperly influencing a juror, can be grounds for a new trial" but applying the Cullen prejudice test). Accordingly, we will not end our analysis with application of the Carey prejudice test but will also apply the Cullen prejudice test.
To determine whether the misconduct was calculated to and with reasonable probability did, influence the verdict, the district court is to judge "[t]he impact of the misconduct ... objectively ... in light of all allowable inferences brought to bear on the trial as a whole." Doe v. Johnston , 476 N.W.2d 28, 35 (Iowa 1991). The inquiry is "whether the extraneous information would prejudice a typical juror." State v. Henning , 545 N.W.2d 322, 325 (Iowa 1996). The "trial court in the exercise of its broad discretion properly could examine the claimed influence critically in light of all the trial evidence, the demeanor of witnesses and the issues presented before making a commonsense evaluation of the alleged impact of the jury misconduct." State v. Christianson , 337 N.W.2d 502, 506 (Iowa 1983).
We conclude the extraneous evidence of a riot or disturbance or threat was "calculated to" influence the jury. See Wells , 437 N.W.2d at 581 (stating juror's visit to the scene was calculated to influence the verdict). The first juror's statement "that there were some threats against the jury depending on what-whatever decision was made" and the third and fourth jurors' statements that they heard if they did not vote for first-degree murder people would be mad and there might be a riot, would have led a reasonable juror to believe outside forces were disseminating information designed to influence the verdict.
The more difficult question is whether the extraneous information with reasonable probability did influence the verdict. As noted, the district court concluded it "would certainly be prejudicial" if information "concerning the possibility of a riot or some other sort of public disturbance or violence occurring if the jury did not find Christensen guilty of something" was "actually considered by the jury during their deliberations." But the court declined to find prejudice because, in its view, "it was not until after the jury had reached their verdict that such evidence was discussed."
In fact, of the nine jurors who said they received extraneous information, at least four remembered receiving the information before the verdict was announced in the courtroom. Because the extraneous information was "actually considered by" certain jurors "during their deliberations," the court's conditional finding of prejudice should have been unconditional. See Johnston , 476 N.W.2d at 35 ("[T]he trial court is in the best position to objectively assess the impact of juror misconduct."); cf. Anderson , 448 N.W.2d at 34-35 (affirming denial of new trial motion where juror was uninfluenced by the comments of the outsider and the other jurors were unaware of the comments until the verdict was reached); Wells , 437 N.W.2d at 580-81 (concluding juror only discussed visit to scene with one juror, who was dismissed and replaced with an alternate juror).
In any event, whether the extraneous information came in before the jurors agreed on a verdict or after the verdict was reached but before it was announced in open court makes little difference because, until a verdict is announced in open court, it is not final. See Iowa R. Crim. P. 2.22(5) ("The jury, agreeing on a verdict unanimously, shall bring the verdict into court, where it shall be read to them, and inquiry made if it is their verdict. ... If any juror expresses disagreement on such poll or inquiry, the jury shall be sent out for further deliberation; otherwise, the verdict is complete and the jury shall be discharged."); see also State v. Jones , 817 N.W.2d 11, 18 (Iowa 2012) ("Even though jurors very rarely change their verdict when polled, the possibility that they may change their verdict requires a court to insist that the jury return its verdict in the presence of the defendant."); id. ("The requirement that verdicts be announced in open court vindicates the judicial system's symbolic interest in maintaining the appearance of justice and its pragmatic interest in giving the finder of fact a final opportunity to change its decision." (citation omitted)). Because the verdict had to be unanimous and the jurors could have changed their minds in open court, we conclude the misconduct was calculated to and with reasonable probability did influence the verdict.
In reaching this conclusion, we have considered the State's argument that there was no prejudice because "the defense theory was that it was second-degree murder, not a premeditated murder" and the defense theory succeeded. To the contrary, the defense did not ask for a finding of guilt on the charge of second-degree murder. The defense pointed out the four options facing the jury-first-degree murder, second-degree murder, voluntary manslaughter, and involuntary manslaughter-and asserted, "[A]t best the evidence establishes that [Christensen] committed the crime of voluntary manslaughter." Christensen's attorney specifically moved for judgment of acquittal on first- and second-degree murder. And in closing argument, he advocated for a finding of guilt on voluntary manslaughter. In short, the defense did not get what it asked for. See State v. Ceretti , 871 N.W.2d 88, 93-94 (Iowa 2015) (distinguishing mental states for first-degree murder, second-degree murder, and voluntary manslaughter and stating, "Because a person could commit voluntary manslaughter under circumstances which would otherwise be second-degree murder, specific intent to kill is not an essential element of voluntary manslaughter").
Nor are we persuaded by the State's contention that the strength of the State's case warrants a finding of no prejudice. The State cited Christensen's admission "to both of his parents and his ex-girlfriend that he harmed the victim," "[t]he gun and ammunition ... discovered in [his] home," "[a] bloodstain on [his] blue jeans and ... on boots" at his home, a text from the victim to his ex-girlfriend "that he gave [Christensen] a ride home on the day of his murder," and "the evidence ... that the victim was killed during a narrow window consistent with when he was with the defendant."
Christensen's attorney conceded most of these facts. He spent little time on whether Christensen shot the young man and whether the man died as a result-both elements of first-degree murder, second-degree murder, and voluntary manslaughter. Instead, he attacked the State's evidence on Christensen's mental state-whether he "acted willfully, deliberately, premeditatedly, and with a specific intent to kill" the young man, as required for a finding of guilt on first-degree murder, and whether he acted with malice aforethought, as required for a finding of guilt on first-degree and second-degree murder. And he elicited evidence supporting the mental state for voluntary manslaughter-"The shooting was done solely by reason of sudden, violent and irresistible passion resulting from serious provocation." He told the jury he would not insult their intelligence by seeking a verdict of "not guilty" and insisted the crime was one of passion. The State's essentially undisputed shooting evidence was not the sticking point; Christensen's mental state was. The extraneous information with reasonable probability could have influenced which mental state the jurors adopted and, hence, which verdict they reached, irrespective of the strength of the remaining evidence.
We are also unpersuaded by the State's reliance on juror testimony minimizing the effect of the extraneous information. As the court stated in Cullen , "statements by jurors, subsequent to deliberations, as to whether they were influenced by certain matters or to what degree they were influenced, are incompetent for the purpose of impeaching a verdict and must be ignored." 357 N.W.2d at 29. "To justify a new trial for jury misconduct it must appear (independently of what jurors might later say) the misconduct was calculated to, and probably did, influence the verdict." State v. Houston , 209 N.W.2d 42, 45 (Iowa 1973). This standard was satisfied.
Notably, the Iowa Supreme Court adopted the "reasonable probability that the misconduct influenced the verdict" test to prevent de minimus extraneous information from upending jury verdicts. See Johnston , 476 N.W.2d at 35 ("Plaintiffs urge us to retreat from this standard and adopt, instead, a rule whereby prejudice is presumed to result from the introduction of extraneous material. We decline the invitation to do so. A certain amount of leeway must be built into the system so that a relatively minor incident of misconduct is not allowed to disrupt what may have been a lengthy, costly, and otherwise fair trial. We are still convinced that the trial court is in the best position to objectively assess the impact of juror misconduct."). The extraneous information in this case was far from de minimus. The information caused jurors to express concerns about their personal safety.
II. Disposition
We conclude the extraneous information introduced into the jury room was calculated to and with reasonable probability did influence the jury verdict. The denial of Christensen's new trial motion amounted to an abuse of discretion. We reverse and remand for a new trial. In light of our disposition, we find it unnecessary to address the remaining issues raised by Christensen.
REVERSED AND REMANDED.
All judges concur except McDonald, J., who dissents.

One juror thought the court was informed. The district court confirmed no one conveyed this post-deliberation information to the court.

In finding a violation of rule 2.24(2)(b)(2), the district court relied on State v. Cullen , 357 N.W.2d 24, 27 (Iowa 1984). There, the Iowa Supreme Court articulated a three-part test for analyzing juror misconduct:
(1) evidence from the jurors must consist only of objective facts as to what actually occurred in or out of the jury room bearing on misconduct; (2) the acts or statements complained of must exceed tolerable bounds of jury deliberation; and (3) it must appear the misconduct was calculated to, and with reasonable probability did, influence the verdict.
Cullen , 357 N.W.2d at 27. The court later clarified the first prong of the test. See Ryan v. Arneson , 422 N.W.2d 491, 495 (Iowa 1988). Applying this test, the district court found a violation of the rule but stated the violation did not exceed the tolerable bounds of jury deliberations. In effect, the court equated the second prong of the Cullen test with the third, prejudice prong. In our view, the second prong-whether the jury exceeded the tolerable bounds of jury deliberation-goes to the question of whether there was misconduct. See Johnson , 445 N.W.2d at 342.

Depending on the recollection of the jurors, the threat required a finding of guilt on the charge of first-degree murder or of something else.