# IN THE COURT OF APPEALS OF IOWA

No. 19-0699
Filed June 3, 2020

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**CHARLES L. CAIN JR.,**
    Defendant-Appellant.

_____

Appeal from the Iowa District Court for Polk County, Scott J. Beattie, Judge.

Charles L. Cain Jr. appeals from convictions for drug offenses. **CONVICTIONS AFFIRMED IN PART AND REVERSED IN PART, SENTENCES VACATED, AND REMANDED FOR RESENTENCING.**

Susan R. Stockdale, West Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Louis S. Sloven, Assistant Attorney General, for appellee.

Considered by Bower, C.J., and Greer and Ahlers, JJ.

**BOWER, Chief Judge.**

We filed our opinion in this appeal on May 13, 2020, but subsequently granted the plaintiff-appellant State of Iowa's petition for rehearing. Our May 13, 2020 decision is hereby vacated, and this opinion replaces it.

Charles L. Cain Jr. appeals from convictions for conspiracy to deliver methamphetamine while in possession of a firearm, possession of methamphetamine with intent to deliver while possessing a firearm, and failure to possess a drug tax stamp. He challenges the sufficiency and weight of evidence supporting his convictions and also contends the court abused its discretion in ruling on the admissibility of evidence. We affirm Cain's possession-with-intent-to-deliver conviction, reverse his conspiracy and tax-stamp convictions, vacate the sentences, and remand for resentencing.

## I. Background Facts and Proceedings.

At about 1:00 a.m. on September 28, 2018, Deputy Bradley Hook was patrolling an unincorporated area of Polk County when he observed a van with a camera mounted over the license plate, obstructing the letters on the license plate. Deputy Hook attempted a traffic stop, activating his siren and lights. The van turned on its right blinker, slowed, and appeared to be pulling over. But the van then picked up speed and continued on. Deputy Hook pursued the van for about fourteen minutes over rural roadways and through neighborhoods at speeds ranging from twenty to eighty-five miles per hour. Additional law enforcement vehicles joined the pursuit. The pursuit was recorded by the officers' dash cameras.

During the pursuit, Deputy Hook saw items being thrown from the van. He remembered seeing papers, bags, something that "looked like a hammer or hatchet," and "some needles" thrown from the passenger side of the van. Deputy Hook saw a methamphetamine pipe and a handgun thrown from the driver's side. Deputy Jacob Murillo was behind Deputy Hook and also observed items being thrown from the passenger-side window. The chase ended when the van drove into a residential driveway and was blocked by several police vehicles.[1]

Police officers surrounded the van and ordered the occupants out. Deputy Murillo approached the van on the passenger side. The passenger exited the van and was placed in handcuffs. The passenger refused to identify himself. The driver—Joshua Olson—remained in the van clutching a dog despite being ordered out of the vehicle. Olson, still clutching his dog, moved about in the van and then rolled into the back. Deputy Hook described the back of the van: "The bench seats weren't there. It was kind of like a big bed. A bunch of clothes, pillows, blanket." The officers used a stun gun on Olson twice before pulling him out through a rear window broken out by officers.

Olson told the officers the passenger was Cain. When searched, Cain had nothing on his person. On Olson's person, Deputy Hook found a small plastic baggie containing methamphetamine and a dollar bill wrapped around a "larger shard" of methamphetamine. Officers also located about $500.[2]

Deputy Murillo observed,

---

[1] The owner of the residence was related to the driver.
[2] The record is not clear from where this money was recovered, though Detective Kemmer testified it was recovered from Olson.

As the passenger exited the vehicle, I saw two hypodermic needles in the passenger seat. One had a cap on it and appeared to be unused. The other was uncapped and appeared to have a clear liquid substance inside, which is consistent with methamphetamine.

Q. And were those items on the passenger seat as that passenger was exiting the vehicle? A. Yes.

Q. And did you observe those things right away? A. I did.

Officers also found loose crystals on the passenger seat and a small plastic zipper bag with a clover imprint containing .36 grams of methamphetamine on the floor near the passenger-side door.[3] There were cotton swabs scattered about.[4] Inside a black leather bag located between the passenger and driver seat, officers found several small new plastic zipper bags with a clover imprint and a digital scale. There were also loose crystals of methamphetamine on the driver's seat. Officers collected the loose crystals from the two front seats and placed them into an available small zipper bag; the crystals were later weighed as 0.33 grams. On the floor on the driver's side, there was a large plastic zipper bag containing methamphetamine (net weight of 5.92 grams) under a jug containing water.[5] In the back of the van, where Olson was sitting before he was dragged from the van, officers found two large baggies containing methamphetamine weighing 59.6 grams (approximately two ounces). Officers also found four cell phones, two of

[3] Field tests and later testing identified all the crystalline substances and the liquid in the syringe as methamphetamine.

[4] Cotton swabs are used to absorb liquid, and then a syringe can be inserted into the cotton to extract the liquid.

[5] Deputy Jacob Murillo testified at trial: "On the driver's seat, there was loose methamphetamine spread everywhere over the seat. And then there was a gallon jug of water which had a little bit of water inside of it and then a gallon sized [plastic bag] underneath that. And inside the bag was also more methamphetamine." The outside of the large bag of methamphetamine was "extremely wet," and there was water inside the bag as well. It looked like an attempt to destroy the drugs because "[m]ethamphetamine would dissolve if it was wet."

which were on the floor near the passenger seat and were later determined to be Cain's.

Because of the amounts of methamphetamine found, Detective Jeremy Kemmer of the Mid-Iowa Narcotics Enforcement task force was contacted and came to the scene to assist the other officers.

Officers were tasked to look for discarded items along the route of the chase later that morning. Polk County Sheriff's Deputy Brian Anderson found "three different types of syringe bags" near lottery tickets. One of the syringe bags had been designed to hold "ten single use needles." Officer Jacob Cusack located a loaded handgun near a mailbox where Deputy Hook reported he saw it skid to a stop after it was thrown out the driver's side window.

Olson and Cain were jointly charged with conspiracy to deliver a controlled substance while in possession or control of a firearm, possession of a controlled substance with intent to deliver while possessing a firearm, failure to possess a tax stamp, and eluding. The two were tried separately.

At Cain's trial, Detective Kemmer testified he had been asked to review the evidence obtained from the van. He testified the quantity of narcotics can indicate personal use or distribution:

> The types of weights that it's generally bought are from a gram. Above a gram you could have what's called a teener. A teener is around 1.75 grams of meth. Above that you'll have what's referred to as a ball or an eight ball. That's 2.75 grams. Above there you'll have quarter ounce, half ounce, whole ounce. And then quarter pound, half pound, pound.
> . . . .
> Generally for user amounts you'll have around a ball size, an 8th of an ounce, and below. Commonly the sizes above that such as a quarter ounce, half ounce, and up, those are generally dealer type amounts.

Detective Kemmer testified that the quantity of plastic bags and the digital scale found in the van were indicative of distribution rather than personal use:

> Generally dealers have some sort of packing material. Whether it's sandwich bags, something that—[plastic storage] bags. Some type of container that they can put the meth in for distribution. Common other tool is a digital scale. They don't want to give more than they sell so they'll weigh the amount so it's accurate or more times than not a little less than what the agreed upon amount is.

Detective Kemmer also testified drug traffickers commonly attempted to distance themselves from drugs or destroy evidence to avoid apprehension. Detective Kemmer stated that the amount of methamphetamine recovered from the van was consistent with narcotics trafficking.

Detective Kemmer also searched Cain's cell phones. He testified Olson was a contact in one of Cain's cell phones.

Over the defense's objection, redacted portions of Cain's text messages between Cain and another person were admitted. The following exchange then occurred:

> Q. And, detective, I'm going to hand you that as well. Can you read across when the messages was sent, by whom, and what was said? A. It's from a number—you want the number also?
> Q. No. Just the description of the contact. A. From a number on 9/24/2018 at what would be 10:14 p.m. to the defendant's phone. "Dude, I really need some of that money."
> A return text to a number, the previous number, on 9/24/2018 at 10:15 says, "I know, bro. I got some shit."
> Another text to the defendant's phone at 9/24/2018 at 10:20 reads, "I am so broke."
> From the defendant's phone to that person at 9/24/2018 at 10:24 p.m. says, "I get that. Me too, bro. I have nothing. No rent money. Not shit. I'm fucked, but don't worry. I got you, bro."
> Q. Now, detective, based on those text messages, how did that interplay in your investigation? A. Well, it's somebody's asking him for money. It's apparent that the defendant owes someone money. The defendant says, I got some shit. Shit, poop, are

common terms referring to meth. And then at the end the defendant tells what looks like J-Quick in his contacts, I get that. Me too.

I get that, he's broke. He doesn't have anything, but says not to worry. I got you. So to me that infers that he's got drugs to sell and he'll be able to pay him once he gets rid of it some of it. Sell some of it.

The messages were exchanged four days before the September 28 pursuit.

On cross examination, the following exchange occurred between defense counsel and Detective Kemmer:

Q. Okay. Now I want to ask you a few questions about the total amount of methamphetamine that was found, roughly [sixty-three] grams.[6] Now the information—well, correct me if I'm wrong. The information you received was when Mr. Olson was found in the back of the vehicle. He was on top of two of the larger bags of methamphetamine, would that be was that correct? A. Yes.
Q. And those would be the bags that had 27.81 grams and the other bag that had 28.06 grams; correct? A. . . . Correct.
Q. Thank you. The 5.92 gram bag that, would have been the bag that was located at Mr. Olson's feet; correct? A. Yes.
Q. . . . The .33 gram bag, that would have been the one that was found in Olson's pocket; correct? . . . . A. Yes.
. . . .
Q. Okay. Thank you. Now the 27.81 gram bag and the 28.06 gram bag, I mean, those would be really consistent with narcotic delivery; correct? A. Yes.

On redirect, the prosecutor asked Detective Kemmer:

Q. You were also asked about whether Mr. Olson was a contact on Mr. Cain's phone; is that right? A. Yes.
Q. And you were asked if there was anything referring to narcotics transactions between them and you said not explicitly; is that right? A. Yes.
Q. What did you mean by not explicitly? A. I can't remember exactly how the conversation went. There was—
[DEFENSE COUNSEL]: Your Honor, I'm going to object at this point. If we may approach.
THE COURT: You may.
(Bench discussion was held off the record.)[7]

---

[6] This represents the net weight of the methamphetamine in the van.
[7] A later record was made about the objection made during the bench conference. Defense counsel objected on two grounds, the first of which he would later

[PROSECUTOR]: Detective Kemmer, I'm going to rephrase that question for you. When you reviewed the conversations between Mr. Olson and Mr. Cain, earlier you said there was nothing explicit relating to narcotics trafficking. Without telling us what those messages were, were there items that based on your training and experience could implicitly have been referencing narcotics distribution? A. Yes.

Q. And you're also asked—from those messages, was it apparent based on your review that they knew each other? A. Yes.

The defense moved for a judgment of acquittal, asserting there was no evidence of an agreement sufficient to prove a conspiracy and that Cain's proximity to drugs was not sufficient to show possession. The State argued:

Whether it's in the physical distribution itself or in the destruction of evidence, which is suggested through the testimony of Detective Kemmer about narcotics dealers intent to conceal their actions from law enforcement. Here there is overwhelming evidence to suggest that not only did Mr. Cain know it was in the vehicle, not only did he know the illegal nature of what he had, but he knew he had to get rid of it. And he got rid of the majority of it. In the video items are continuously flying out the window. And I believe the jurors can make reasonable inferences from what's being thrown that Mr. Olson/Mr. Cain knew each other, that there's a large quantity of narcotics in the vehicle found not just merely in proximity, but everywhere. And some of those same items that are found next or on where the defendant is seated, were flying out the window during the chase. And the evidence does support that.

The case was submitted to the jury, who found Cain guilty of conspiracy to deliver a controlled substance, possession with intent to deliver,[8] and failure to possess a tax stamp. The jury found Cain not guilty of eluding. Cain appeals.

**II. Scope and Standard of Review.**

We review challenges to the sufficiency of the evidence for the correction of legal error. *State v. Cashen*, 666 N.W.2d 566, 569 (Iowa 2003). We uphold the

---

withdraw. "But the other objection I made though was—was that it was commenting on evidence that was not introduced at the trial."

[8] The first two charges were subject to a firearm enhancement.

jury's verdict if the record contains substantial evidence to support it. *Id.* Substantial evidence is the quality and quantity of proof that could convince a rational fact finder that the defendant is guilty beyond a reasonable doubt. *Id.* To gauge whether the evidence is substantial, we review the record in the light most favorable to the verdict. *Id.*

We review rulings on motions for new trial based on the weight of the evidence for an abuse of discretion. *State v. Serrato*, 787 N.W.2d 462, 472 (Iowa 2010). We also review evidentiary rulings for an abuse of discretion. *State v. Huston*, 825 N.W.2d 531, 536 (Iowa 2013). We will find an abuse of discretion only if the "court's decision rested on grounds or reasoning that were clearly untenable or clearly unreasonable." *State v. Plain*, 898 N.W.2d 801, 811 (Iowa 2017).

## III. Sufficiency of the Evidence.

Cain first argues there is not substantial evidence to support the convictions. With respect to the conspiracy conviction, Cain contends there is not sufficient evidence of an agreement between him and Olson. With respect to the convictions for possession with intent to distribute and failure to possess a tax stamp, Cain challenges the sufficiency of the evidence to establish he possessed a controlled substance or had an intent to distribute, and whether the amount of controlled substance was large enough to require a tax stamp. We will address each in turn.

*A. Conspiracy.* "A conspiracy is essentially a criminal contract characterized as a concert of free wills, union of the minds of at least two persons, and a mental confederation involving at least two persons." *State v. Kern*, 831 N.W.2d 149, 159 (Iowa 2013) (citation and internal quotation marks omitted).

"Conspiracies are, by nature, clandestine affairs."  *Id.*  Because direct evidence of an agreement to form a conspiracy is often absent, "we have consistently allowed circumstantial evidence and inferences drawn from the circumstances to support a conviction on a conspiracy charge."  *Id.*

The jury was instructed that to convict the defendant of conspiracy to deliver a controlled substance, the State was required to prove all of the following: (1) On or about the 28th day of September, 2018, Cain "agreed with Joshua Olson" that "one or both of them would deliver or attempt to deliver a controlled substance, in this case methamphetamine"; (2) Cain "entered into such an agreement with the intent to promote or facilitate the delivery of methamphetamine"; (3) Cain or Olson "committed an overt act to accomplish the delivery of methamphetamine"; and (4) Olson, the "co-conspirator, was not a law enforcement agent or assisting law enforcement when the conspiracy began."

The jury was also instructed:

The State must prove the defendant and Joshua Olson came to a mutual understanding that possession of methamphetamine with the intent to deliver would be attempted or committed.  The agreement can be oral or written, informal or formal, and need not be detailed. It may be proven by direct or circumstantial evidence of a person's words, actions or gestures.

Cain contends there is insufficient evidence of an agreement with Olson to deliver methamphetamine.  The State argues that the circumstantial evidence taken as a whole—Cain's presence in the van, Olson's name as a contact in Cain's cellphone, Cain's texts to another suggesting a drug sale four days prior, and Cain's throwing items from the van—establish an agreement to distribute methamphetamine.  While we agree this evidence may be indicative of aiding and

abetting an illegal activity, we cannot agree it is sufficient to establish a conspiracy. *See State v. Huser*, 894 N.W.2d 472, 504 (Iowa 2017) ("By attempting to help Woolheater load the body into the trunk of her vehicle and helping Woolheater load Morningstar's tractor onto Woolheater's truck, Zwank may well have been aiding and abetting the criminal acts of Woolheater, *but aiding and abetting and conspiracy are different concepts.*"[9] (emphasis added)). Finding an agreement existed by between Olson and Cain confounds the concepts of aiding and abetting and conspiracy.

An interpretation of vague text messages exchanged between Cain and another person in conjunction with Cain's presence in a van with methamphetamine four days later is too attenuated and speculative to establish Cain "agreed with Joshua Olson" that "one or both of them would deliver or attempt to deliver a controlled substance, in this case methamphetamine."

"Circumstantial evidence of an agreement must be based on more than suspicion." *Kern*, 831 N.W.2d at 159. "Evidence is not substantial if it raises only

---

[9] In *State v. Huser*, 894 N.W.2d 472, 490–91 (Iowa 2017), the court explained:

> [I]n order to support an aiding and abetting theory, the record must contain substantial evidence that the accused assented to or lent countenance and approval to the criminal act "either by active participation or by some manner encouraging it prior to or at the time of its commission." We observed, "Knowledge is essential; however, neither knowledge nor presence at the scene of the crime is sufficient to prove aiding and abetting."
>
> Aiding and abetting may be proven by direct or circumstantial evidence. Direct and circumstantial evidence are equally probative. We have stated that a fact finder may infer a defendant's participation from all of the surrounding circumstances of the illegal activity, including evidence of presence, companionship, and conduct before and after the offense is committed.

(Citations omitted.)

suspicion, speculation or conjecture." *State v. Speicher*, 625 N.W.2d 738, 741 (Iowa 2001). The record evidence raises only suspicion or speculation of an agreement between Cain and Olson. We cannot uphold a conviction based on mere speculation. *See id.* at 742. We therefore reverse Cain's conviction for conspiracy to deliver a controlled substance.

*B. Possession with intent to distribute.* "In the realm of controlled substance prosecutions, possession can be either actual or constructive." *Cashen*, 666 N.W.2d at 569. Here, the State relies on a theory of constructive possession.

Constructive possession exists when the evidence shows the defendant "has knowledge of the presence of the controlled substance and has the authority or right to maintain control of it." *State v. Maxwell*, 743 N.W.2d 185, 193 (Iowa 2008) (citation omitted). "Constructive possession may be proved by inferences." *State v. Reed*, 875 N.W.2d 693, 705 (Iowa 2016). Although a defendant's proximity to the contraband is pertinent, it "is not enough to show control and dominion." *Id.* (citation omitted). In determining whether the defendant possessed contraband discovered in jointly occupied structures, there are several nonexclusive factors to consider:

> (1) incriminating statements made by a person; (2) incriminating actions of the person upon the police's discovery of a controlled substance among or near the person's personal belongings; (3) the person's fingerprints on the packages containing the controlled substance; and (4) any other circumstances linking the person to the controlled substance.

*Id.* at 706 (citation omitted). But mere suspicion, speculation, or conjecture cannot establish guilt. *See id.*

Although methamphetamine was not found on Cain's person, substantial evidence could support a finding that he had constructive joint possession of methamphetamine in the area of the front seats of the van on September 28, 2018. Cain could not have been blind to the existence of the methamphetamine in the front of the van—he was sitting on it, and on his van seat was a syringe of methamphetamine with an exposed needle. As observed by Deputy Hook, "Just walking up to [the van], you could see paraphernalia all over. Baggies. Loose meth laying everywhere." When asked if it is common to find loose scattered methamphetamine in a vehicle, Deputy Hook responded: "No. . . . I mean, it cost them money. They don't want to lose it. . . . [T]hey usually take pretty good care of it. Keep it nearby." A baggy of methamphetamine was on the floor under the passenger seat near two cell phones, at least one of which was Cain's. Items had been thrown from the passenger side of the van, including packaging for hypodermic needles and a needle. There was also other evidence of an attempt to destroy or conceal methamphetamine; there was a gallon zipper bag of crystalline substance at Olson's feet. The leather bag with extra baggies and the digital scale was between the passenger and driver's seats. A rational jury could find Cain was in constructive possession of the methamphetamine recovered in and around the front seats of the van.

The State asserts the jury could find Cain was in possession of all the contraband in the van, arguing:

> Here, Cain had sent messages only four days earlier, claiming that he received a "zip" and referring to the fact that he "just got some shit" to solve his money problems. Then, only four days later, Cain was found in the presence of multiple "zips" of methamphetamine, after he was the primary participant in efforts to dispose of syringes,

> something that resembled money, and other items as his companion led police on a high-speed chase.
>
> . . . .
>
> . . . And even [Detective Kemmer's explanation of his impressions of the text messages] omits mention of Cain's participation in concealing evidence, and his refusal to cooperate with the police. Jurors could reasonably infer that Cain acted that way because he had skin in the game: it was his methamphetamine too.

While we agree the evidence allows an inference that Cain was aware of and had the ability to control the drugs in the immediate vicinity of the passenger seat, his control of the drugs in the back of the van based on mere proximity is conjecture. This is not a case where the vehicle belonged to the driver. *See State v. McMullen*, No. 18-2249, 2019 WL 6907458, at *5 (Iowa Ct. App. Dec 18, 2019) ("Here, the factors supporting that McMullen possessed the contraband are as follows. The car belonged to McMullen. All of the contraband, and particularly the backpack, was within McMullen's reach. McMullen claimed he did not know the contraband was in the vehicle . . . . Yet a reasonable person would have observed the open, exposed cup in the console containing marijuana."). Nothing in the record indicates Cain was ever in the back area of the van or had any knowledge of the drugs in the back of the van. *See In re W.E.*, No. 18-1717, 2019 WL 3714827, at *2 (Iowa Ct. App. Aug. 7, 2019) ("But there is no evidence the handguns were among W.E.'s personal effects. Nor did she own the vehicle. And while one of the handguns was found in plain view on the backseat floorboard, the record does not show where the guns were in relation W.E.—as opposed to the other three people in the backseat."). When the van was stopped, Cain emerged from the front seat as ordered to by the responding officers. Olson alone moved to the back of the van where the larger baggies of methamphetamine were found.

The State offered no evidence that Cain had knowledge of or control over the baggies of methamphetamine found in the back of the van. Proximity is not sufficient to show control and dominion. *Cashen*, 666 N.W.2d at 572. We can only speculate whether Cain was able to "maintain control over the drugs or have the right to control the drugs" that were in the back of the van. *See Kern*, 831 N.W.2d at 161 ("In the absence of actual possession, constructive possession requires the person to maintain control over the drugs or have the right to control the drugs.").

We affirm the conviction for possession of a controlled substance with intent to distribute.

*C. Firearm enhancement.* Cain also now contends his arguments as to possession should be applied to the firearm enhancement. However, that issue was not raised below. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal."). The issue is not preserved for our review.

*D. Failure to possess a drug tax stamp.* In order to prove a drug stamp tax violation, the State was required to prove Cain knowingly possessed seven grams or more of methamphetamine. As we have concluded above, there is sufficient evidence Cain constructively possessed methamphetamine in the front of the van—but the methamphetamine in the front of the van had a net weight of less

than seven grams.[10]   Consequently, we reverse the conviction for failure to possess a drug stamp tax.

## IV. Evidentiary Rulings.

Cain first asserts the court abused its discretion in ruling in limine that Cain was not allowed to impeach Detective Kemmer's testimony that Cain's texts messages implicitly suggested Cain was involved in drug trafficking by showing Detective Kemmer first recommended only charging Cain with possession of a controlled substance.  However, we agree with the State that this claim of error was not preserved.  When the trial court ruled on the motion in limine, it noted, "obviously an issue like this is very contextual as far as the argument is concerned," making it "very difficult for the Court to make a ruling that's general in scope" before the witness testifies.  The court stated: "[I]t would probably be appropriate to make a record if necessary and have an offer of proof if necessary on that questioning line if you so desire at the appropriate time."  The defense made no further record or offer of proof.

In any event, defense counsel did ask Detective Kemmer:

> Q. Okay.  Thank you.  Now at the time we took your deposition on the 22 of February, I asked you as you were there testifying under oath if you had any evidence of a conspiracy to deliver narcotics between Mr. Cain and Mr. Olson.  Do you remember what your answer was?
> MR. GROVE: Objection.  Your Honor, may we approach?
> THE COURT: You may.
> (Bench discussion was held off the record.)
> THE COURT: There is an objection that is pending on the question that was posed.  The objection is overruled.  You may answer the question.

---

[10] The zipper bag at the driver's feet contained 5.92 grams of methamphetamine. The zipper bag beneath the passenger seat contained .29 grams.  And the methamphetamine collected from the passenger seat had .26 grams.

THE WITNESS: I believe I said, no.

Cain next argues the court abused its discretion in admitting Cain's text messages into evidence. The trial court found these messages were admissible on the issue of intent and did not violate the prohibition against evidence of prior bad acts. We do not disagree the text messages had some probative value with regard to an intent. But the district court's ruling on the post-trial motion indicates the text messages presented a danger of unfair prejudice.

In ruling on the motion for new trial, the court noted, "Officers also located messages on the defendant's phone relating to trafficking narcotics, *specifically methamphetamine*, which were dated a few days prior to the pursuit." (Emphasis added.) We must observe the messages did not relate "specifically [to] methamphetamine"; rather, the texts to "J-Quick" read, "I got some shit" and "Get a hold of me I got another zip." Detective Kemmer testified that "zip" "is a common reference as a measurement of weight for an ounce of a substance," which might include methamphetamine but "more typically marijuana cases use the term zip." He also testified "shit" is a common street name for methamphetamine. Whether the relevance of the text messages was substantially outweighed the danger of unfair prejudice is a close question. But we cannot say that the district court abused its discretion in allowing their admission.

Because we reverse the convictions for conspiracy and failure to affix a drug tax stamp, we vacate the sentences imposed and remand for resentencing.

**CONVICTIONS AFFIRMED IN PART AND REVERSED IN PART, SENTENCES VACATED, AND REMANDED FOR RESENTENCING.**